OPINION
{¶ 1} Appellants/cross-appellees and appellees/cross-appellants appeal from the October 11, 2006 judgment entry of the Geauga County Court of Common Pleas, which granted a directed verdict for appellees/cross-appellants. For the following reasons, we affirm.
 {¶ 2} Substantive and Procedural History *Page 2 
 {¶ 3} Proposed Sale of the Business and Real Estate to an EmployeeGroup
 {¶ 4} Arthur Chandler ("Art"), now deceased, was the sole shareholder of the Chandler Group ("CG"), an umbrella corporation comprised of various insurance companies. Art contacted his accountant, John Gale ("Mr. Gale"), on April 10, 2003, with the proposal of selling CG to his employees since he was contemplating retirement. Art had attempted to sell CG to his employees before, either in 2001 or 2002, and he mentioned the idea in 1999. However, the early 2000 offer to the board of directors was rescinded after the board proposed dividing the corporation. Art had a corporate "family philosophy" and his intent was for CG to stay together. He called Mr. Gale to inquire whether such a proposal would be viable.
 {¶ 5} Mr. Gale was instructed to calculate the finances of CG, and when he asked Art for an estimate of CG's worth, Art replied that he estimated CG's worth to be approximately $80 million dollars. At that point, Mr. Gale advised Art that this proposal would be a waste of time since there was no possibility that the employees would be able to afford such an amount and that he would be better off giving them a bonus.
 {¶ 6} Some time progressed and on July 10, 2003, Art called a meeting with six of his employees; Ms. Holly Chandler ("Holly,) who is also Art's daughter and was head of advertising relations; Ms. Eileen Romansky ("Ms. Romansky",) chief of operations; Mr. Michael Mitchell ("Mr. Mitchell",) head of business development; Mr. Todd Bliss ("Mr. Bliss",) head of the information technology ("IT") department; Ms. Kimberly Fiori, *Page 3 
head of provider relations; and Ms. Diane Dixon, comptroller for the accounting department. At that meeting Art nicknamed these six employees the "six-pack."[1]
 {¶ 7} At the meeting, Art offered the six-pack an opportunity to purchase CG. Alternatively, Art asked the six-pack if they would rather he sell to a third-party and give them each a million dollars. All six rejected the million dollar offer and sought the opportunity to purchase CG, although Holly testified that she does not remember the million dollar promise being made.
 {¶ 8} At this initial meeting, Art first mentioned a purchase price of $80 million. The asking price was eventually lowered to $50 million with a collective one million dollar down payment, which would require each of the six to pay approximately $166,666. Ms. Romansky testified in her deposition that price was not discussed in detail at this meeting.
 {¶ 9} All six signed a confidential disclosure agreement agreeing to not disclose any confidential information about CG that they discovered during the course of the transaction. The deal was to include CG and Stratford Place, the building in which CG was headquartered.
 {¶ 10} Stratford Place was owned by Benona Properties LLC, whose shareholders were Art, Art's wife, Mary Chandler ("Mary",) who is also the appellee/cross-appellant and executor and trustee of Art's Estate, Holly, and their son and Holly's brother, Todd Chandler ("Todd".) Further, the projected closing date for the transaction was to be January 1, 2004. Art also wanted to ensure that his son, Todd *Page 4 
Chandler, and Clay Wade, the Stratford Place building superintendant, would have jobs at all times, although this provision was never included in any of the purchase agreement drafts.
 {¶ 11} The next and final meeting between the six-pack and Art was held on July 23, 2003. This time, in addition to Art and the six-pack, also present were Mary and Keith Kern ("Mr. Kern",) who was the attorney handling this transaction. There is conflicting testimony as to whether Mr. Gale was also present.
 {¶ 12} Mr. Kern was retained by CG, and it was agreed at this meeting that CG would pay Mr. Kern's attorney fees, which it did in the amount of more than $50,000. Subsequently, the six-pack individually signed consent letters on August 11, agreeing to dual representation by Mr. Kern. None sought the advice of independent counsel, although they were advised to do so. In addition, none of the six-pack engaged in any form of due diligence, nor did they engage an independent accountant at any time during the transaction. A letter of intent was never signed or executed between CG and the six-pack nor was a business plan formulated. In addition, CG paid all of Mr. Gale's fees.
 {¶ 13} At the July 23, 2003 meeting it was agreed that the building would be appraised. However, an independent appraisal was never conducted of the building. Instead, at some point, Art took two former appraisals that were done on Stratford Place and set the purchase price of Stratford Place at $3,000,000. He determined the down payment would be $60,000 or $10,000 each; and wanted to fund their loan so no *Page 5 
outside mortgage would be needed. Ms. Romansky was appointed the "point-person" for the six-pack.
 {¶ 14} From the time of this meeting to the initiation of this suit, none of the six-pack put their $10,000 share of the earnest money in escrow, nor did any of the six-pack take concrete steps towards obtaining financing for their share. Also at some point, Art decided to forgo the $1,000,000 down payment on CG since it became clear that the amount of the down payment for the business would present a hardship.
 {¶ 15} A Turn of Events as Arthur Chandler Becomes Terminally Ill
 {¶ 16} Unfortunately in mid-August of 2003 Art was diagnosed with lung cancer that had metastasized to his brain. There were no further meetings held between Art and the six-pack before his death on October 27, 2003. In the interim, purchase agreements for both CG and the building were drafted. None were completed, had agreed upon mutual terms, nor were any signed by all the parties.
 {¶ 17} Also during this time, the six-pack, with the counsel of Mr. Kern sought to incorporate as the Chandler Integrity Group LLC ("CIG",) in order to purchase CG; and to incorporate as the Stony Group LLC, in order to purchase Stratford Place. However, CIG was never incorporated, articles of incorporation were never filed, no stock certificates were ever issued, and the officers were never elected. The Stony Group was successfully incorporated in that a certificate of incorporation was filed.
 {¶ 18} Although the four-pack alleged that Benona Properties breached an oral contract with the Stony Group for the sale of Stratford Place, they failed to include the Stony Group in this action. *Page 6 
 {¶ 19} Between the July 23, 2003 meeting and Art's passing on October 27, 2003, Art and Ms. Romansky discussed several other terms, which were never finalized. These included Ms. Romansky's requirement that there be $500,000 in cash for operating expenses. She also requested that a clause be inserted by which the six-pack could defer the purchase price payments in the case of pending and/or existing litigation expenses. In addition, there was an unresolved matter about loans that Mary, Holly, and Todd had made to CG in 2002 so that CG could purchase an insurance company, Preferred Plan of Illinois ("PPI".) Specifically, CG had an outstanding debt of over $2,000,000 from these loans. Mary was owed approximately $2,070,000; Holly, approximately $230,000; and Todd, approximately $400,000.
 {¶ 20} The payment for CG was structured to be paid in installments over a nine-year period. Their installment payments would be derived from the revenues of the corporation. Thus, none of the six-pack had any personal funds invested in the transaction, nor would they incur much risk. If they were unable to meet their payments and a default incurred due to loss of revenue the corporation would revert back to Mary who would essentially be left with a valueless corporation.
 {¶ 21} Ms. Romansky sent a draft of a proposal, with a request for modifications on October 17, 2003, via email to Mary and Art. At this time, Art was bedridden and at his residence. She did not receive a reply regarding this proposal, which is the last draft of an agreement that was sent to Art before his passing on October 27, 2003. As for the sale of Stratford Place by Benona Properties Ltd. to the Stony Group, Art and Mary signed a purchase agreement. However, it was postdated to January 1, 2004, and was not signed by either Holly or Todd. Benona Properties Ltd. was owned collectively by *Page 7 
Art, Mary, Holly and Todd. Holly and Todd each owned a 40% share of Benona Properties Ltd. and Art and Mary each owned a 10% share. A "time is of the essence" clause was also included in this particular draft. All subsequent drafts of the purchasing agreement for Stratford Place were incomplete and failed to include Todd's signature.
 {¶ 22} On November 3, 2003, the six-pack sent a letter to all CG employees and clients that informed them that CIG would be the new owner of CG. The letter was signed by the six-pack and Mr. Mitchell, as "president" of CIG (officers were never elected by CIG nor was CIG ever incorporated.) By their own admissions, all testified that this letter was sent prematurely and contained misrepresentations.
 {¶ 23} The next and final meeting between Mary and the six-pack occurred on December 12, 2003. Also present were Mr. Kern and Mr. Gale. The meeting took most of the day and ended with three crucial terms left unresolved. Specifically, there was no agreement as to how the PPI loans of over $2,000,000 owed to Mary, Holly, and Todd by CG would be repaid. Secondly, no provision was made for Ms. Romansky's requirement that there be at least $500,000 in cash as start-up for CIG. Thirdly, there was no clause that dealt with a payment deferment in the case of litigation.
 {¶ 24} As was customary at CG in December, Mary gave out bonuses to all the employees. However, Mary declined to take her dividend and instead gave all the employees large bonuses, some totaling over $20,000. On December 16, 2003, Mary notified the six-pack that the transaction would have to be put on hold since she had and continued to have reservations regarding the transaction. On December 18, 2003, Mary sent Ms. Romansky a letter promoting her to Art's former position, chief operating officer. Mary also notified the six-pack in a letter on December 19, 2003, she would be *Page 8 
retaining independent counsel and that CG would no longer be paying the six-pack's attorney fees.
 {¶ 25} After the receipt of this December 19, 2003 letter, the six-pack did nothing more to inquire about the purchase of CG or Stratford Place. On March 16, 2003, a meeting was held with the six-pack and Mary's counsel, Mr. Leonard Carr ("Mr. Carr",) to discuss Mary's concerns over the finances of the six-pack and the unsettled terms.
 {¶ 26} Sale to an Outside Buyer
 {¶ 27} In early 2004, CG was approached by the Interplan Health Group ("IHG",) an outside prospective purchaser. CG received two letters of intent from IHG in February of 2004 and the six-pack was aware that negotiations between CG and IHG were occurring during this time. However, none of the six-pack attempted to resume negotiations or stop the sale to IHG from occurring. It is clear that the six-pack was informed of the sale to IHG by March 4, 2003, and on March 31, 2004, Mary and the six-pack met regarding the sale. Mary informed the group at this meeting that after researching the potential sale of CG to the six-pack she believed that such a sale would not be in the best interests of her family, employees, or clients. Mary also informed them that she had included a provision in her purchase agreement with IHG for over $1,000,000 in bonuses to be distributed as employee incentives for staying with the new company. Indeed, all six were offered salaries that were the same or higher, in addition to stock offerings and various other employee incentives that made their positions even more lucrative and generous than they were in the past.
 {¶ 28} At this point, the six-pack had retained the law firm of Baker Hostetler to help them review the proposed new employee agreements or letters from IHG. The six-pack *Page 9 
chose not to pursue an injunction to stop the sale of CG to IHG, and, in fact, took no action other than signing employee agreements or letters. The sale to IHG was finalized on June 17, 2004.
 {¶ 29} Mr. Bliss, Mr. Mitchell, Ms. Fiori, and Ms. Romansky (hereinafter collectively referred as the "four-pack"), sent a letter to Mary informing her of their intent to sue since they believed they had an oral contract to purchase both CG and Stratford Place on July 23, 2003, or that in the alternative, pursuant to Art's offer, she owed them each a $1,000,000. Mary's counsel, Mr. Carr responded in a letter dated October 17, 2004, denying their claims, and again in a letter dated November 22, 2004, averring the same.
 {¶ 30} The Litigation
 {¶ 31} The four-pack then filed a complaint on November 15, 2004, in the Geauga County Probate Court alleging that Mary, in her role as executor and trustee of Art's estate, had breached two oral contracts between Art and the six-pack for the sale of CG and Stratford Place; or in the alternative, that Mary owed each of them $1,000,000 since they did not purchase the company. The complaint was amended on December 20, 2004. In turn, on January 5, 2005, Mary filed her answer and counterclaim, alleging that the four-pack's action was frivolous and in violation of Ohio Civ.R. 11 and R.C. 2323.51.
 {¶ 32} On January 14, 2005, the four-pack filed a motion to dismiss pursuant to Civ.R. 12(B)(6) and a motion to quash a subpoena duces tecum issued to the four-pack's former counsel at Baker Hostetler citing privilege. The probate court, sua *Page 10 
sponte, on January 18, 2005, transferred the case to the Geauga County Court of Common Pleas.
 {¶ 33} The court overruled the four-pack's motion to dismiss Mary's counterclaim and denied Mary's request for sanctions on February 17, 2005. On March 3, 2005, Mary filed a motion for a protective order with another request for sanctions and attorney fees. The four-pack filed their reply to Mary's counterclaim on March 11, 2005, and their brief in opposition to Mary's motion for a protective order on March 17, 2005. On February 7, 2005, the magistrate filed an order which denied the motion to quash the subpoena duces tecum, ordered an in-camera inspection of the requested document, and deferred a ruling on Mary's motion on attorney fees. Further, on March 28, 2005, the court issued a judgment entry that overruled Mary's motion for a protective order and her request for sanctions.
 {¶ 34} As the case proceeded to trial, depositions were filed of Mr. Bliss, Mr. Mitchell, Ms. Romansky, Mr. Kern, Mr. Gale, Ms. Dixon; as well as Dr. Harold Mars, Holly, Ms. Amy Falcione, Ms. Romansky, Mary, Ms. Fiori, Mr. Carr; in addition to Mr. Aaron Conway Finch, Dr. Conomy, and Dr. Steinberg.
 {¶ 35} On November 3, 2005, Mary filed a motion for leave to file a motion for summary judgment, which the court granted on November 15, 2005. Mary then filed her motion for summary judgment on November 21, 2005. The four-pack responded in their brief in opposition on December 15, 2005, and then moved the court to permit them to file a corrected brief in opposition, which was granted on January 10, 2005. The court then overruled Mary's motion for summary judgment on February 1, 2006. *Page 11 
 {¶ 36} Mary then filed a motion to dismiss or in the alternative a motion for judgment on the pleadings on July 11, 2006, to which the four-pack responded by filing a brief in opposition on July 17, 2006. Both the four-pack and Mary filed various motions in limine and a motion to strike, which the court overruled on August 7, 2006, with the exception of granting Mary's motion in limine with respect to testimony or evidence of an unrelated case, which involved a Mr. Daniel Stypula and Art, acting on behalf of CG. The court also, sua sponte, bifurcated Mary's counterclaim from the complaint.
 {¶ 37} A jury trial was then held on August 7, 8, and 9 of 2006. Mary filed a motion for a directed verdict on August 9, 2006, at the close of the four-pack's case-in-chief, which the court sustained in part, finding that no contract for the purchase of CG existed since the agreement between the six-pack and Art called for the purchase of CG's stock by the six-pack would occur for over one hundred seven months or nine years. Thus, the court found that their agreement failed as a matter of law since it was not in writing as required by the statute of frauds. At the close of Mary's case on the same day, August 9, the court then granted a directed verdict in favor of Mary on the issue of the agreement to purchase Stratford Place, after determining that the four-pack had failed to join an indispensable party since the purported sale for Stratford Place was between Benona Properties and the Stony Group.
 {¶ 38} The court issued its complete findings in a judgment entry filed August 14, 2006. The court found, inter alia, that the alleged oral contract provided that a corporation to be formed by the four-pack would purchase the stock for $50 million, that the four-pack's intent was to pay the purchase price over a period of one hundred seven *Page 12 
months; and that the funds from the purchase would come from the revenues of the companies being purchased. Further, the court found that although the unsigned promissory note that was to be executed by the never formed corporation, CIG, contained a prepayment clause, it was clear and undisputed that the performance of the alleged oral contract would take almost nine years to be complete. It was also clear and undisputed between the parties that the alleged oral contract was intended to be reduced to writing and that the written agreement was never executed by either the six-pack, nor by Mary, nor by Art. Further, since the alleged agreement for the purchase and sale of the stock is governed by R.C. 1335.05, the Statute of Frauds, it was required to be in writing.
 {¶ 39} As to the sale of Stratford Place, the court found that a written purchase agreement was prepared by Benona Properties Ltd. to sell the real property to Stony Group, and that it was signed by Art and Mary on behalf of Benona Properties Ltd., and was signed by Ms. Romansky, Ms. Bliss, Ms. Dixon, Ms. Fiori, and Mr. Mitchell as members of the Stony Group LLC, which did file articles of organization on October 22, 2003. Stony Group was required as the purchaser to execute a promissory note and a mortgage deed, and to pay $60,000 in earnest money to a title company. However, Stony Group never met these conditions of sale, nor did any of the individual members contribute any money to the Stony Group. Furthermore, an operating agreement as defined by R.C.1705.02(J) was never executed by the members of the Stony Group LLC. In addition, Stony Group LLC was the named purchaser and they were not named as plaintiffs in the case. The four-pack were not named as purchasers of the real *Page 13 
property, and thus, they had no claim to the property. Thus, the court sustained Mary's motions for directed verdict on all counts of the four-pack's complaint.
 {¶ 40} The court then entered a judgment on September 21, 2006, in favor of Mary and against the four-pack. In addition, the four-pack was ordered to pay the costs of the proceeding. The court then issued a final judgment entry on October 11, 2006, after holding an October 10, 2006 status conference with counsel. The court determined that Mary's claims for attorney fees and expenses, based upon her claims that the four-pack's allegations were frivolous and in violation of Civ.R. 11, would be more appropriately addressed as a post-decree matter. Thus, the judgment sustaining Mary's motion for directed verdict was entered as a final appealable order, from which both parties timely appealed. We will address each of the parties' assignments of error in turn.
 {¶ 41} The four-pack now raises two assignments of error:
 {¶ 42} "[1.] The trial court erred in granting defendants' motion for directed verdict on plaintiffs' claim of breach of oral contract for the sale of stock of the Chandler Group of Companies.
 {¶ 43} "[2.] The trial court erred in granting defendants' motion for a directed verdict on plaintiffs' claim of breach of oral contract for the sale of real estate."
 {¶ 44} Directed Verdict
 {¶ 45} The four-pack's assignments of error address the trial court's decision to grant Mary's motion for a directed verdict.
 {¶ 46} Pursuant to Civ.R. 50(A)(4), "[w]hen a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in *Page 14 
favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
 {¶ 47} "Under this rule, a trial court may not grant a directed verdict unless the evidence, when construed in the light most favorable to the nonmoving party, leads reasonable minds to only one conclusion, and that conclusion is adverse to the nonmovant." Huffman v. Kazak Bros.Inc. (Apr. 12, 2002), 11th Dist. No. 2000-L-152, 2002 Ohio App. LEXIS 1660, 10, citing Fleegle v. Funtime, Inc. (Sept. 30, 1999), 11th Dist. No. 98-G-2158, 1999 Ohio App. LEXIS 4640, 7.
 {¶ 48} "A motion for a directed verdict does not present a question of fact or raise factual issues; rather, it presents a question of law, even though in deciding such a motion it is necessary to review and consider the evidence." Id. at 10, citing Ruta v. Breckenridge-RemyCo. (1982), 68 Ohio St. 2d 66, paragraph one of the syllabus. "A motion for a directed verdict tests the legal sufficiency of the evidence, not the weight of the evidence or the credibility of witnesses." Id., citingOsier v. Lorain (1986), 28 Ohio St.3d 345, 347. "Because a motion for a directed verdict presents a question of law, an appellate court must conduct a de novo review of the trial court's judgment." Id., citingNichols v. Hanzel (1996), 110 Ohio App.3d 591, 599.
 {¶ 49} The Purchase of CG
 {¶ 50} In their first assignment of error, the four-pack asserts that the trial court erred by granting a directed verdict on their breach of oral contract claim for the purchase of CG since the oral agreement between the six-pack and Art was not *Page 15 
required to be in writing pursuant to the statute of frauds and that the evidence was not construed most strongly in favor of the four-pack as the nonmoving party. We find these assertions to have no merit.
 {¶ 51} A review of the record reveals that the question of whether or not the alleged oral contract was barred by the statute of frauds, pursuant to R.C. 1335.05, is irrelevant since there was no evidence of a binding oral contract for the purchase of CG between Art and the six-pack.
 {¶ 52} In order to be successful on a breach of contract claim, the four-pack was required to provide evidence of the following: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damages. Id. at 11, citing Doner v. Snapp (1994),98 Ohio App. 3d 597, 600.
 {¶ 53} The evidence in this case reveals that there was no contract that contained all of the essential terms of the agreement made between Art and the six-pack on July 23, 2003, as Ms. Romansky herself testified at trial. Rather, basic, material terms were not agreed upon and were changed after this meeting. Thus, we find that the four-pack failed to prove that an oral contract even existed.
 {¶ 54} The parties at that time had just signed confidential disclosure agreements as a predicate to the process of due diligence. Most fundamentally, the purchase price changed to reflect Art's decision to forgo the $1,000,000 collective down payment for the purchase of the company after learning that the $166,666 required from each of the six-pack would cause them each a severe hardship. Indeed, material terms were left unresolved as late as the December 12, 2003 meeting, well after Art's passing. That December meeting ended with a complete lack of agreement as to how CG would be *Page 16 
repay the over $2,000,000 in loans that were made by Holly, Art, and Mary so that CG could purchase PPI in 2001. The topic of the PPI loans did not even come into discussion with Art either at the meeting or before his untimely passing.
 {¶ 55} It is true that "[t]o have a valid and enforceable contract there must be an offer by one party and an acceptance of the offer by another." Id. at 11-12, citing Camastro v. Motel 6 Operating, L.P. (Apr. 27, 2001), 11th Dist. No. 2000-T-0053, Ohio App. LEXIS 1936, 9. However, "for there to be a proper offer and acceptance, parties to a negotiation must have a meeting of the minds." Id., citing Gall v. Trumbull Mem.Hosp. (July 7, 2000), 11th Dist. No. 99-T-0102, 2000 Ohio App. LEXIS 3053, 7.
 {¶ 56} "The party claiming that there was a meeting of the minds may show this by `the surrounding circumstances which make it inferable that the contract exists as a matter of tacit understanding.'" Id. at 12, citing Gall, at 8, quoting Biddle v. Warren Gen. Hosp. (Mar. 27, 1998), 11th Dist. No. 96-T-5582, 1998 Ohio App. LEXIS 1273. "However, courts should only consider objective manifestations of intent when determining whether the parties had a meeting of the minds in a particular case." Id. at 13, citing Nilavar v. Osborn (1998), 127 Ohio App. 3d 1, 12.
 {¶ 57} "In addition to a meeting of the minds, a contract must also be definite and certain with respect to its essential terms." Id. at 13, citing Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus.Relations (1991), 61 Ohio St.3d 366, 369. "Essential terms include such things as the identity of the parties to the contract, the subject matter of the contract, and consideration." Id., citing McMillian v.Haueter (Apr. 30, 1999), 11th Dist. Nos. 98-G-2124 and 98-G-2125,1999 Ohio App. LEXIS 2019, 11, quoting Alligood v. Proctor Gamble Co.
(1991), 72 Ohio App. 3d 309, 311, 312. *Page 17 
 {¶ 58} "[T]he terms of a contract are sufficiently certain if they `provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Id. at 13-14, citing Nilavar, quotingMr. Mark Corp. v. Rush, Inc. (1983), 11 Ohio App. 3d 167, 169. "Furthermore, `if the court can determine that the parties intended to be bound, it may fashion those less essential terms that were omitted in order to reach a fair and just result." Id., citing Gurich v.Janson (Nov. 17, 2000), 11th Dist. No. 99-A-0066, 2000 Ohio App. LEXIS 5369, 12.
 {¶ 59} "However, as the Supreme Court of Ohio observed inLitsinger Sign Co., Inc. v. Am. Sign Co. (1967), 11 Ohio St. 2d 1, 14: "It is settled law that if the parties' manifestations taken together as making up the contract, when reasonably interpreted in the light of all the circumstances, do not enable the court to determine what the agreement is and to enforce it without, in effect `making a contract for the parties,' no enforceable obligation results." Id. at 14.
 {¶ 60} Indeed, that is the very case that is presented here, for if we were to find that an oral contract existed, for such a sophisticated transaction to occur, the court would essentially be creating a contract for the parties, since so many essential terms are missing from the alleged oral contract made on July 23, 2003. Even more fundamental is the fact that Mary never assented to this transaction, either before or after Art's death. Rather, she testified that at the time of the July 23, 2003 meeting she still had doubts and reservations. After obtaining independent counsel and investigating the matter further, she determined in early 2004 that the sale of CG to the six-pack would not be in the best interests of herself, her employees, or her clients. Thus, to force Mary into a contract, and then to fashion such essential elements of a contracts as *Page 18 
price and a provision for CG's outstanding debt, the court would surely be overstepping its bounds and fashioning an inequitable remedy.
 {¶ 61} Moreover, the four-pack failed to prove any damages suffered in reliance on this agreement. "Damages are an essential element to a breach of contract claim." Allen v. Znidarsic Brothers, Inc. (Dec. 29, 2000), 11th Dist. No. 99-L-088, 2000 Ohio App. LEXIS 6206, 9, citingHarper v. Miller (1957), 109 Ohio App. 269; American Sales, Inc. v.Boffo (1991), 71 Ohio App. 3d 168, 176. None engaged independent counsel nor hired an outside accountant during the negotiations. None of the six-pack spent any of their own personal finances for this venture, nor did they take serious steps to procure the financing that would be necessary. All six testified that they did not forgo any serious employment offers during the time period of July to December of 2003, and all were offered generous compensation and employment letters and/or agreements from IHG. Furthermore, against the advice of their former counsel, which they procured in early 2004 for the purpose of reviewing IHG's employment offers, they did not seek an injunction to stop the sale of CG to IHG, nor did they attempt to resume negotiations after the December 12, 2003 meeting.
 {¶ 62} In addition, the six-pack wanted the sale to be structured in such a way that the purchase payments for CG would be generated from the company's revenue stream. They had no personal assets invested; rather, all the risk in the case of default was placed on the seller. If the six-pack defaulted on their payments and the amount came due, if one considers the acceleration clause included on one of the multiple drafts of purchase agreements applicable, then Mary would be left with stock from a valueless corporation. There was simply no agreement, orally or otherwise, between *Page 19 
the parties that contained all of the essential terms that would be required to make this purchase a reality.
 {¶ 63} We also note that the six-pack intended to incorporate CIG, and that CIG was to actually make the purchase. However, CIG was never incorporated, stock certificates were never issued, and officers were never elected. Quite simply, CIG does not exist.
 {¶ 64} The four-pack also contends that the trial court erred in granting a directed verdict since the court did not properly construe the evidence in favor of the nonmoving party. This contention has no merit. It is true that the trial court is required to "give the nonmoving party the benefit of all reasonable inferences that may be drawn from the evidence." Huffman at 9, citing Broz v. Winland (1994),68 Ohio St.3d 521, 526. However, it is only "[w]hen there is sufficient credible evidence to permit reasonable minds to reach different conclusions on an essential issue, the trial court must submit that issue to the jury." Id., citing O'Day v. Webb (1972),29 Ohio St. 2d 215, paragraph four of the syllabus.
 {¶ 65} In this case, there is simply no evidence of an oral contract when construed most favorably to the nonmoving party as the oral contract alleged is void of essential terms.
 {¶ 66} The four-pack's first assignment of error is without merit.
 {¶ 67} The Purchase of Stratford Place
 {¶ 68} In their second assignment of error, the four-pack contends that the trial court erred in granting a directed verdict to Mary on their claim for the purchase of real estate, known as Stratford Place. This argument fails for similar reasons. *Page 20 
 {¶ 69} The evidence reveals that there was one draft of a purchase agreement signed by Art and Mary on October 20, 2003, on behalf of Benona Properties that purported to sell Stratford Place to the Stony Group. However, the agreement was only signed by Mary and Art. Neither Holly nor Todd Chandler signed the agreement. Moreover, the document was not dated October 20, 2003, the date it was signed, but was postdated for January 1, 2004. In addition, the draft had blanks. None of the individual six-pack members contributed money to their limited liability corporation, Stony Group, nor did the Stony Group deposit the $60,000 in escrow. No mortgage note or deed was executed by Stony Group, the purchaser. Pursuant to the statute of frauds, an agreement for the sale of property is required to be in writing. The only document that contained signatures is incomplete and was not given with consideration.
 {¶ 70} Moreover, the four-pack failed to include Stony Group as a party plaintiff, since it was the Stony Group that was to purchase Stratford Place from Benona Properties. The four-pack contends that the court based its directed verdict in favor of Mary on the breach of contract claim for Stratford Place upon their failure to join an indispensable party. However, the four-pack fails to realize that this was merely one finding among many supporting the court's determination that there was no complete contract to sell Stratford Place to the six-pack.
 {¶ 71} The four-pack's second assignment of error is without merit.
 {¶ 72} The Cross-Appeal of Mary Chandler, et al.
 {¶ 73} Mary also timely appeals the October 11, 2006 judgment of the Geauga County Court of Common Pleas and raises six assignments of error: *Page 21 
 {¶ 74} "[1.] The trial court erred in denying appellees/cross-appellants' motion for summary judgment; no contract existed.
 {¶ 75} "[2.] The trial court erred in denying appellees' motion for summary judgment; the statute of frauds barred appellants' claims.
 {¶ 76} "[3.] The trial court erred in denying appellant's [sic] motion to dismiss or, in the alternative, motion for judgment on the pleadings.
 {¶ 77} "[4.] The trial court erred in precluding the appellees from introducing evidence as to Todd Chandler's competency or lack of capacity.
 {¶ 78} "[5.] The trial court erred in precluding the appellees from introducing evidence as to Arthur's Chandler's competency or lack of capacity.
 {¶ 79} "[6.] The trial court erred in failing to grant a directed verdict on the additional ground that no contract existed."
 {¶ 80} Summary Judgment
 {¶ 81} In her first and second assignments of error, Mary contends that the trial court erred in denying her motion for summary judgment since no contract existed, and that if it did, the statute of frauds barred appellants' claims.
 {¶ 82} "Pursuant to Civ.R. 56(C), summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Holik v. Richards, 11th Dist. No. 2005-A-0006, 2006-Ohio-2644, ¶ 12, citing Dresher v. Burt (1996),75 Ohio St.3d 280, 293. "In addition, it must appear from the evidence and stipulations that reasonable minds can come to only one conclusion, which is adverse to the nonmoving party." Id., citing Civ.R. 56(C). Further, "[t]he *Page 22 
standard in which we review the granting of a motion for summary judgment is de novo." Id., citing Grafton v. Ohio Edison Co. (1996),77 Ohio St.3d 102, 105.
 {¶ 83} Accordingly, "[s]ummary judgment may not be granted until the moving party sufficiently demonstrates the absence of a genuine issue of material fact. The moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim."Brunstetter v. Keating, 11th Dist. No. 2002-T-0057, 2003-Ohio-3270, ¶ 12, citing Dresher at 292. "Once the moving party meets the initial burden, the nonmoving party must then set forth specific facts demonstrating that a genuine issue of material fact does exist that must be preserved for trial, and if the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." Id., citing Dresher at 293.
 {¶ 84} Summary judgment is not be viewed lightly as a "little trial" or as docket control since summary judgment denies the party his or her "day in court." Welsh v. Ziccarelli, 11th Dist. No. 2006-L-229,2007-Ohio-4374, ¶ 40. Further, "the jurisprudence of summary judgment standards has placed burdens on both the moving and the nonmoving party. In Dresher v. Burt, the Supreme Court of Ohio held that the moving party seeking summary judgment bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record before the trial court that demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim. The evidence must in the record or the motion cannot succeed. The moving party cannot discharge its initial burden under Civ.R. 56 simply *Page 23 
by making a conclusory assertion that the nonmoving party has no evidence to prove its case but must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) that affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. If the moving party has satisfied its initial burden, the nonmoving party has a reciprocal burden outlined in the last sentence of Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial. If the nonmoving party fails to do so, summary judgment, if appropriate shall be entered against the nonmoving party based on the principles that have been firmly established in Ohio for quite some time in Misteff v.Wheeler (1988), 38 Ohio St.3d 112." Id. at ¶ 40.
 {¶ 85} "The [Supreme Court] in Dresher went on to say that paragraph three of the syllabus in Wing v. Anchor Media, Ltd. of Texas (1991),59 Ohio St.3d 108, * * * is too broad and fails to account for the burden Civ.R. 56 places upon a moving party. The court, therefore, limited paragraph three of the syllabus in Wing to bring it into conformity with Mitseff." Id. at ¶ 41.
 {¶ 86} Thus, the Supreme Court in Dresher, "went on to hold that whenneither the moving nor nonmoving party provides evidentiary materials demonstrating that there are no material facts in dispute, the moving party is not entitled to a judgment as a matter of law as the moving party bears the initial responsibility of informing the trial court of the basis for the motion, "and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." Id. at ¶ 42, citingDresher at 276. *Page 24 
 {¶ 87} We do not find that the court erred in denying Mary's motion for summary judgment, since a review of the record reveals that at the time the motion was made, genuine issues of material fact existed as to whether oral contracts existed for the purchase of CG and Stratford Place. In such a case, where multiple parties are involved, a key party to the purported contract is deceased, the documents outline sophisticated transactions, and the evidentiary materials before the court at the summary judgment stage presented many unresolved, contentious issues, we cannot say that the trial court erred in overruling the motion.
 {¶ 88} Mary's first and second assignments of error are without merit.
 {¶ 89} Motion to Dismiss
 {¶ 90} In her third assignment of error, Mary contends that the trial court erred in not granting her motion to dismiss, or in the alternative, her motion for judgment on the pleadings.
 {¶ 91} "An appellate court's standard of review for a trial court's actions regarding a motion to dismiss is de novo." State ex el. Malloyv. City of Girard, 11th Dist. No. 2006-T-0019, 2007-Ohio-338, ¶ 8, citing Clark v. Alberini (Dec. 14, 2001), 11th Dist. No. 2001-T-0015, 2001 Ohio App. LEXIS 5665, 4.
 {¶ 92} Further, the Supreme Court of Ohio has held that "[dismissal of a complaint for failure to state a claim upon which relief can be granted is appropriate if, after all factual allegations of the complaint are presumed true and all reasonable inferences are made in [nonmoving party's] favor, it appears beyond doubt that [nonmoving party] can prove no set of facts warranting relief." Id. at ¶ 9, citingClark v. Connor (1998), 82 Ohio St.3d 309, 311. *Page 25 
 {¶ 93} Moreover, "Ohio is a notice-pleading state." Id. at ¶ 10, citing Cincinnati v. Beretta U.S.A. Corp., 95 Ohio St.3d 416, ¶ 29. "Thus, a complaint need only contain `a short and plain statement of the claim showing that the party is entitled to relief.'" Id. quoting Civ.R.8 (A)(1).
 {¶ 94} A review of the record reveals that Mary's assertion that the court erred in denying her motion to dismiss is without merit. Specifically, the complaint, when construed in favor of the nonmoving party, raises a genuine claim as to whether there was a breach of contract between the six-pack and Mary. The four-pack sufficiently pled claims of breach of oral contract in their complaint.
 {¶ 95} Mary's third assignment of error is without merit.
 {¶ 96} Evidentiary Rulings of Competence
 {¶ 97} In her fourth and fifth assignments of error, Mary contends that the trial court erred in precluding evidence as to the competency of both Todd and Arthur Chandler.
 {¶ 98} "The admission or exclusion of evidence rests in the sound discretion of the trial court." Sedivy v. Sedivy, 11th Dist. Nos. 2006-G-2687 and 2006-G-2702, 2007-Ohio-2313, ¶ 48, citing State v.Sage (1987), 31 Ohio St.3d 173, 180. "Therefore, we will not reverse the trial court's decision to exclude this evidence unless it is determined that the trial court abused its discretion in doing so." Id., citingState v. Kimble, 11th Dist. No. 2005-T-0086, 2006-Ohio-6863, ¶ 8, citingState v. Benson, 11th Dist. No. 2001-P-0086, 2002-Ohio-6942, ¶ 7.
 {¶ 99} Upon review, we find that the trial court did not abuse its discretion since neither Todd's nor Art's competency was an issue at trial. *Page 26 
 {¶ 100} As to the issue of Todd Chandler's competency, the record reveals that the court never ruled on this issue, nor did Mary proffer the deposition of Dr. Neil Steinberg, Todd Chandler's psychiatrist. In fact, the issue of Todd's competency was not brought before the court, nor is it relevant since the operating agreement for Benona Properties requires only a majority of the members to approve a matter. Thus, if the purchase agreement for Stratford Place had been signed by Mary, Art, and Holly, and if the agreement had been complete, their signatures would have sufficed to complete the transaction if all other requirements for an enforceable purchase agreement were met.
 {¶ 101} Second, Art's competency was not at issue since the CG stock owned by Art was transferred to his trust on October 20, 2003. Mary, as the successor trustee, took action on the stock after the transfer, thus it is only her competency that is at issue in this matter. The following colloquy occurred during a side-bar conference between the court and the parties' counsel:
 {¶ 102} "The Court: Okay. Then the Court will not hear any evidence regarding Arthur Chandler's competency. The trust cannot take advantage of the transfer of the stock to the trust and then determine that he was not competent. If she sold the stock as trustee, she took advantage of the transfer and consequently, I will not hear any testimony regarding Arthur Chandler's competence.
 {¶ 103} "* * *
 {¶ 104} "Mr. L. Carr [Mary's counsel]: I respectfully disagree with the Court's position and I would like to proffer the evidence of his competency for the record at the appropriate time. *Page 27 
 {¶ 105} "The Court: You may proffer. And thanks for reminding me. I also note that Doctor Mars did not determine that Arthur Chandler was incompetent. But since I've already ruled because of the transactions, that's just pointing that out."
 {¶ 106} Indeed, a review of Dr. Harold Mars' deposition confirms the court's statement that Dr. Harold Mars did not declare Art was incompetent. Further, as the colloquy demonstrated, Art's competency was simply not at issue, since the stock of CG was transferred to Art's trust. To allow the trust to take advantage of the transfer, yet at the same time argue that Art was incompetent, would only serve to allow the successor trustee, Mary, to escape any responsibility and yet allow her to control the stock for her benefit.
 {¶ 107} We find the trial court did not abuse its discretion.
 {¶ 108} Mary's fourth and fifth assignments of error are without merit.
 {¶ 109} Directed Verdict
 {¶ 110} In her sixth assignment of error, Mary contends that the trial court erred by not granting a directed verdict in her favor on the additional ground that no contract existed. Since we conducted a de novo review and found that there were no contracts for either the purchase of CG or Stratford Place, this assignment of error is moot.
 {¶ 111} The judgment of the Geauga County Court of Common Pleas is affirmed.
CYNTHIA WESTCOTT RICE, P.J., COLLEEN MARY OTOOLE, J., concur.
[1] Prior to this meeting, on July 8, Art held a meeting with five of the six-pack to inform the group he wanted to retire and wanted to offer them CG and Stratford Place, the building which housed the CG headquarters. Kim Fiori was not present for that meeting because she worked out of the CG office in Michigan. Thus, Art told them he would follow up with a meeting when all six could be present, which happened on July 10, 2003. *Page 1