JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiffs-appellants, Russell and Grace Perla, appeal the judgment of the Cuyahoga County Common Pleas Court that denied their motions for judgment notwithstanding the verdict and for a new trial after a jury entered a verdict in favor of defendant-appellee, The Cleveland Clinic Foundation, on appellants' complaint for negligence, lack of informed consent and loss of consortium. For the reasons that follow, we affirm.
 {¶ 2} The record reveals that Russell Perla ("appellant") underwent a lumbar laminectomy at The Cleveland Clinic Foundation ("CCF") in July 2000. On the third post-operative day, appellant's condition began to deteriorate. Sometime thereafter, he was diagnosed with an epidural hematoma[1] that resulted in spinal cord compression. Although appellant underwent decompressive surgery to alleviate the symptoms associated with the hematoma, he, nonetheless, sustained permanent neurological damage.
 {¶ 3} Appellant brought suit against CCF, asserting claims for medical malpractice and lack of informed consent. Included in the lawsuit was a claim by appellant's wife, Grace, for loss of consortium. The case proceeded to jury trial. The jury ultimately returned a verdict in favor of CCF. Appellant[2] thereafter moved for judgment notwithstanding the verdict and for a new trial, which the trial court denied.
 {¶ 4} Appellant is now before this court and challenges this decision, assigning six errors for our review.[3]
 I. Motion for Judgment Notwithstanding the Verdict {¶ 5} When ruling on a motion for judgment notwithstanding the verdict, a trial court employs the same test applicable to a motion for directed verdict. That is, the evidence as adduced at trial and as borne by the record must be construed most strongly in favor of the party against whom the motion is made. Where there is substantial evidence to support the non-movant's side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination when ruling upon either of the above motions.Posin v. ABC Motor Court Hotel, Inc. (1976), 45 Ohio St.2d 271,275; see, also, Texler v. D.O. Summers Cleaners Shirt Laundry
(1998), 81 Ohio St.3d 677, 679. Appellate review of a motion for judgment notwithstanding the verdict is de novo. Schafer v. RMSRealty (2000), 138 Ohio App.3d 244, 257-258.
 {¶ 6} We must thus determine whether reasonable minds could come to one conclusion regarding appellant's claims for medical malpractice and lack of informed consent so as to be entitled to judgment notwithstanding the verdict. We conclude that reasonable minds could differ and that appellant is, therefore, not entitled to judgment in his favor as a matter of law.
 A. Medical Malpractice {¶ 7} In order to establish a claim for medical malpractice, a plaintiff must demonstrate, by a preponderance of the evidence, (1) that there existed a duty on behalf of the physician-defendant to the plaintiff; (2) the standard of care recognized by the medical community; (3) the failure of the defendant to meet that standard of care; and (4) a causal link between the negligent act and the injuries sustained. Bruni v.Tatsumi (1976), 46 Ohio St.2d 127, paragraph one of the syllabus; see, also, Roberts v. Ohio Permanente Med. Group
(1996), 76 Ohio St.3d 483. A plaintiff is required to present expert testimony in order to demonstrate that the actions of a physician fell below the standard of care and that this breach was the cause of the injuries sustained. Bruni,46 Ohio St.2d at 131-132.
 {¶ 8} Appellant contends that there was undisputed evidence that CCF physicians were negligent in failing to timely diagnose that he was suffering from an epidural hematoma. In particular, he maintains that CCF physicians failed to thoroughly examine him following his complaints of pain and ignored physical signs associated with epidural hematoma. He further maintains that there was an unacceptable delay not only in physician response time but in ordering imaging studies once an epidural hematoma was suspected.
 {¶ 9} The record reveals that appellant, a resident of Buffalo, New York, presented to CCF sometime in July 2000 with complaints of back and leg pain. He was seen by Edward Benzel, M.D., who diagnosed neurogenic claudication and lumbar stenosis. This medical condition is characterized by a narrowing of the areas where the nerves exit the spinal column and manifests symptoms such as difficulty walking. Appellant agreed to undergo a lumbar laminectomy, which is a surgical procedure that involves removing the lamina to free space for the spinal nerves.
 {¶ 10} Surgery proceeded as scheduled on July 25, 2000 without complication. Appellant apparently did well the first two days after surgery. He was also doing well during early morning rounds on July 28, 2000, when it was noted at 5:55 a.m. that he had no numbness or leg pain, was moving all extremities well and exhibited no neurological symptoms. Nursing notes thereafter indicate that appellant first complained of pain at 10:45 a.m. when an entry by nurse Kerry Lynn Graczyk, who worked the 7:00 a.m. to 3:30 p.m. shift, noted that appellant had general weakness with "some limited mobility secondary to low back discomfort." Nurse Graczyk further noted and testified that appellant was up with supervision to the bathroom and exhibited no other changes.
 {¶ 11} Appellant's wife and daughter came to visit him at approximately 10:00 a.m. and noted the change in his appearance from the previous two days. They both testified that he complained of having "extreme stabbing pain in his back," but nonetheless they left to visit the zoo once they were satisfied that he had received pain medication. They returned at approximately 3:00 p.m. to still find no change in his appearance. Appellant's daughter, Becky McIntosh, spoke with nurse Jamie Castillo, who worked the 3:00 p.m. to 11:00 p.m. shift relieving Nurse Graczyk. Nurse Castillo examined appellant and noted that he agreed with Nurse Graczyk's earlier assessment but that he additionally found patient in "excruciating pain," rating it a ten on a scale of one to ten, and that he exhibited "facial grimacing" but otherwise his respirations were even and unlabored. Nurse Castillo further noted that he gave appellant pain medication and notified Sam Borsellino, M.D., the neurosurgery resident on call at the time. Nurse Castillo also noted that appellant complained of back spasms and severe pain when moving his legs.
 {¶ 12} Dr. Borsellino testified that he examined appellant after receiving Nurse Castillo's call. He testified that he tested both appellant's muscle strength and sensory awareness and found him to be neurologically intact. He concluded that appellant was experiencing "incisional pain." He further testified that it is common to develop back spasms several days after surgery that can increase back pain and it is also common to experience increased back pain because the patient is getting out of bed and walking more. Dr. Borsellino testified that he saw no need to conduct a rectal examination.
 {¶ 13} Andrew Wakefield, M.D.,[4] also examined appellant sometime between 5:00 p.m. and 7:00 p.m. on July 28, 2000. He testified that, although appellant complained of some increased pain, the examination indicated that appellant was neurologically intact with full strength in his lower extremities. Like Dr. Borsellino, he did not conduct a rectal exam.
 {¶ 14} At 5:00 p.m., Nurse Castillo noted that appellant's pain and muscle spasms were unchanged. After consulting with Dr. Borsellino, appellant was given medication for the spasms. Dr. Borsellino testified that he again examined appellant sometime after 5:00 p.m or 6:00 p.m. Again, he found appellant neurologically intact, with no loss of motor strength or sensory awareness.
 {¶ 15} At 6:55 p.m., Nurse Castillo noted that respirations and pain were unchanged. Appellant tolerated no dinner and had only mild fluid intake. At 8:20 p.m., Nurse Castillo noted again that appellant's pain and respirations were unchanged. He notified Dr. Borsellino of the continued spasms, the lack of pain relief, low fluid input and lack of urinary output. The nurse noted that there would be no further orders at this time "except to encourage oral intake [and] not to worry about output unless patient symptomatic." Dr. Borsellino testified that he was not concerned with the lack of urinary output because appellant had little fluid intake and was neurologically intact.
 {¶ 16} By 10:00 p.m., Nurse Castillo noted that the pain and muscle spasms decreased slightly to seven out of ten. He further noted that although appellant had not urinated, he denied the need to do so and did not experience any lower abdominal discomfort. He further noted that there was no change in neurological status, the facial grimacing was not as severe and appellant's respirations were unchanged.
 {¶ 17} Appellant contends that Dr. Borsellino was negligent in failing to consider that he was suffering from epidural hematoma at this time. That had he done so, he would have found the lack of urinary output significant, conducted a rectal examination and obtained a magnetic resonance imaging ("MRI") study.
 {¶ 18} Appellant's expert witness, Robert Cantu, M.D., testified on his behalf. Dr. Cantu stated that the classic symptoms of an epidural hematoma include (1) a sudden violent onset of pain in the area of the bleed; (2) motor symptoms characterized by mild weakness progressing to more severe motor impairment; (3) sensory symptoms characterized by tingling progressing to numbness; (4) "full-blown" cauda equina syndrome, which includes loss of function of the bowel and bladder, as well as sexual dysfunction. He further stated that the sooner the epidural bleeding can be relieved and the more minimal the neurologic deficit is going into relieving the bleeding, the better the outcome will be. In this regard, Dr. Cantu opined that Dr. Borsellino should have considered the possibility of an epidural hematoma during his 3:30 p.m. examination and that his failure to do so was a deviation from the standard of care. Had he considered such a diagnosis and conducted not only a rectal exam but ordered a MRI as well, Dr. Cantu opined that surgical decompression would have been indicated at this time.
 {¶ 19} Dr. Borsellino testified that he considered the possibility of epidural hematoma but ruled it out based on the lack of neurological symptoms. He testified that any back surgery has some "components of epidural blood," but that a significant epidural hematoma is one that causes neurological symptoms. Dr. Borsellino testified that he did not conduct a rectal exam nor order a MRI because appellant's symptoms did not indicate the need to do so, a conclusion supported by CCF expert witness, Daniel Riew, M.D.
 {¶ 20} We note that Dr. Cantu's opinion, in part, is based on Dr. Borsellino being presented with symptoms of numbness and tingling sometime around 12:00 noon on July 28, 2000. Appellant contends that he complained of pain and numbness sometime between 10:00 a.m. and 12:00 noon on that day. The medical record does not support appellant's testimony, however. Nurses Graczyk and Castillo noted no sensation of numbness or tingling in their notes nor did they testify that appellant complained of numbness or tingling as they recollected their care for appellant. Drs. Borsellino and Wakefield similarly testified that their physical examinations did not reveal any loss of sensation or motor strength. Indeed, their respective examinations indicated an intact neurological system in the early evening of July 28th. Faced with a lack of neurological symptoms consistent with the presence of a epidural hematoma and expert testimony supporting those findings, it cannot be said that there existed undisputed evidence that Dr. Borsellino's actions in caring for appellant deviated from the standard of care.
 {¶ 21} Appellant next contends that CCF was negligent in responding to his worsening neurological symptoms and in failing to timely perform a MRI once these symptoms were medically confirmed.
 {¶ 22} The record reflects that nurse Jennifer Rosales relieved Nurse Castillo for the 11:00 p.m. to 7:00 a.m. shift. Nurse Rosales noted at 12:30 a.m. on July 29, 2000 that appellant continued to experience pain and that he now complained of numbness and decreased sensation. She contacted Jurgen Luders, M.D., who was the resident who relieved Dr. Borsellino. He examined appellant at 2:00 a.m. and noted at 2:30 a.m. that he exhibited significant neurological change. In particular, he found that appellant was experiencing decreased sensation, loss of motor strength and was incontinent of urine. Dr. Luders consulted with the chief resident, George Markarian, M.D., and a stat[5] MRI was ordered. The record indicates that the MRI was performed at 5:17 a.m.
 {¶ 23} Appellant contends that not only was there undisputed evidence indicating that the 90-minute response time exhibited by Dr. Luders was unreasonable and a deviation from the standard of care, but there was also undisputed evidence that the approximate three-hour delay in obtaining the MRI was equally so. Appellant mischaracterizes the evidence presented in this case.
 {¶ 24} Relying on the testimony of Dr. Markarian, appellant maintains that the standard of care required Dr. Luders to see him within 15 to 20 minutes of receiving the call from Nurse Rosales. Dr. Luders testified that he is responsible for between 40 and 60 patients on any given night he is on call, as he was the night he cared for appellant. He further testified that he responded to the nurse's call as soon as he could given whatever exigent circumstances the patients he was caring for required that night, of which he could not specifically recall. Contrary to appellant's arguments, this does not contradict the testimony given by Dr. Benzel, who testified that Dr. Luders should have seen appellant "as soon as he could" or that of Dr. Riew, who testified that Dr. Luders should have responded "as quickly as possible." Indeed, Dr. Riew testified that Dr. Luders's response time was reasonable under the facts of this case. Consequently, there did not exist "undisputed" evidence that Dr. Luders's response time was a deviation from the standard of care, as appellant asserts.
 {¶ 25} Nor was the evidence undisputed that the delay in performing the MRI deviated from the standard of care. John Litchney, an administrator in the Radiology Department at CCF, testified as to the procedure for obtaining a MRI between the hours of 11:00 p.m. and 6:00 a.m., when no MRI technologist is at the hospital. In particular, the technologist on call is required to be at the hospital within 45 minutes of being contacted. Because the technologist who performed the MRI did not arrive at the hospital until 4:45 a.m., appellant contends that the delay from 2:30 a.m until 4:00 a.m. to contact the technologist is unreasonable, as is the delay from the time the technologist arrived at 4:45 a.m until the time the imaging study was finally performed at 5:17 a.m. Dr. Riew, however, testified that this time delay is not unreasonable given the procedures that are necessary in order to obtain a MRI during this time period. Thus, contrary to appellant's argument, there did not exist undisputed evidence that such a delay deviated from the standard of care.
 {¶ 26} Indeed, Dr. Riew opined that appellant "crossed the threshold from just having pain to having neurologic deficits" at approximately 12:30 a.m. on July 29, 2000. From that point forward, the standard of care required decompressing the epidural hematoma within twelve hours, which, in this case, was accomplished at 6:10 a.m. — less than six hours. In Dr. Riew's opinion, any delay in Dr. Luders's response time or in finally obtaining the MRI was not unreasonable nor a deviation from the standard of care. As such, there was no "undisputed evidence" to support appellant's claims for medical malpractice and he was, therefore, not entitled to judgment notwithstanding the verdict on this issue.
 B. Lack of Informed Consent {¶ 27} Appellant claims that Dr. Benzel failed to inform him of the risk of an epidural bleed and that such a bleed could cause loss of sexual function. He further contends that he would not have had the surgery had he been informed of this risk.
 {¶ 28} The doctrine of informed consent is based on the theory that every competent human being has a right to determine what shall be done with his or her own body. Siegel v. Mt. SinaiHosp. (1978), 62 Ohio App.2d 12. The law of informed consent has never required that the physician, prior to administering treatment, fully inform the patient of all the potential risks.Bedel v. Univ. of Cincinnati Hosp. (1995), 107 Ohio App.3d 420,427, citing O'Brien v. Angley (1980), 63 Ohio St.2d 159. Rather, the proper standard of disclosure was set forth by the Supreme Court of Ohio in Nickell v. Gonzalez (1985),17 Ohio St.3d 136, at the syllabus:
 {¶ 29} "The tort of lack of informed consent is established when:
 {¶ 30} "(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;
 {¶ 31} "(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and
 {¶ 32} "(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy." See, also, Turnerv. Cleveland Clinic Found., Cuyahoga App. No. 80949, 2002-Ohio-4790, at ¶¶ 21-24. The plaintiff has the burden of proving by expert medical evidence what a reasonable medical practitioner of the same discipline, practicing in the same or similar communities under the same or similar circumstances, would have disclosed to his patient about the risks incident to a proposed treatment and of proving that the physician departed from that standard. Bedel v. Univ. OB/GYN Assoc., Inc. (1991),76 Ohio App.3d 742, 744.
 {¶ 33} Dr. Benzel testified and documented that he informed appellant of the risks of infection, paralysis, pain, heart attack, blood clots and bowel and bladder dysfunction. He further testified that he informed appellant of the potential risk of hemorrhage, which is defined as abnormal bleeding, and, in particular, of developing a hematoma. Although appellant concedes that Dr. Benzel informed him of the risk of heart attack, infection and stroke, he testified that he never mentioned anything about the potential for sexual dysfunction. Dr. Benzel admitted as much when he testified that he may not have told appellant of this particular risk.
 {¶ 34} Notwithstanding Dr. Benzel's admission, Dr. Riew testified that Dr. Benzel adequately informed appellant of the risks associated with surgery. Indeed, Dr. Riew opined that Dr. Benzel conducted a "thorough and complete discussion." Thus, there was evidence before the jury that a reasonable person in appellant's position, after being informed of risks discussed by Dr. Benzel, would have proceeded with surgery performed by him. Consequently, appellant was not entitled to judgment notwithstanding the verdict on this issue.
 II. Motion for New Trial {¶ 35} Civ.R. 59 governs new trials and provides, in part, that a new trial may be granted when the jury's verdict is not sustained by the weight of the evidence. Civ.R. 59(A)(6). The decision to grant or deny a motion for a new trial is discretionary with the court and will not be reversed by a reviewing court absent an abuse of that discretion. Malone v.Courtyard by Marriott L.P. (1996), 74 Ohio St.3d 440, 448. A trial court does not abuse its discretion in denying such a motion if a verdict is supported by sufficient, credible evidence, however. See, generally, Rohde v. Farmer (1970),23 Ohio St.2d 82, 91-92.
 {¶ 36} "* * * [I]n ruling on a motion for new trial upon the basis of a claim that the judgment `is not sustained by sufficient evidence,' the court must weigh the evidence and pass upon the credibility of the witnesses, not in the substantially unlimited sense that such weight and credibility are passed on originally by the jury but in the more restricted sense of whether it appears to the trial court that manifest injustice has been done and that the verdict is against the manifest weight of the evidence." Id. at paragraph three of the syllabus; see, also,Antal v. Olde Worlde Prod., Inc. (1984), 9 Ohio St.3d 144, 147.
 {¶ 37} Appellant contends that the evidence presented at trial weighs in his favor. In particular, he argues that there was overwhelming evidence that (1) Dr. Benzel failed to adequately inform him of the risks associated with surgery; (2) Dr. Borsellino failed to adequately examine and diagnose him as suffering from an epidural hematoma; (3) Dr. Luders failed to timely examine him and insure that imaging studies were done promptly.
 {¶ 38} As discussed in Section I, there was sufficient, credible evidence presented to refute each of appellant's arguments, thereby permitting the jury to render a verdict absolving CCF on appellant's claims for medical malpractice and lack of informed consent. Despite appellant's arguments to the contrary, we see no manifest miscarriage of justice and must give due deference to the trial court's discretion in denying the motion for a new trial based on the weight of the evidence.
 III. Conclusion {¶ 39} We find no error in the trial court's decision denying appellant's motions for judgment notwithstanding the verdict and for a new trial. Substantial evidence was presented on appellant's claims for medical malpractice and lack of informed consent upon which reasonable minds could reach different conclusions, thereby making judgment in his favor as a matter of law unwarranted. Nor was a new trial justified because sufficient evidence was presented from which the jury could find for CCF on appellant's claims.
 {¶ 40} We are not unsympathetic to the injuries sustained by appellant as a result of the surgery he elected to undergo. The law, however, does not provide a remedy for every injury sustained in the absence of a violation of some duty imposed by law. The trier of fact, having listened to the evidence, found no such violation for which appellant could recover.
Judgment affirmed.
It is ordered that appellee recover of appellants costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, P.J., and Calabrese, Jr., J., concur.
[1] Defined as a "swelling or mass of blood (usually clotted)" that is confined to, in this case, the spinal cord.
[2] We will refer to Russell Perla and his wife collectively as "appellant" for ease of discussion.
[3] Although CCF filed a cross-appeal challenging the denial of its motion in limine seeking to exclude evidence of certain medical expenses, it failed to file a brief in support. We, therefore, dismiss CCF's cross-appeal pursuant to App.R. 18(C).
[4] Dr. Wakefield was completing a one-year spine fellowship at CCF. Prior to this fellowship, he had completed a one-year general surgery internship and a seven-year neurosurgery residency program in Connecticut.
[5] "Stat" is the Latin term for "immediately."