OPINION
{¶ 1} Appellants, Suzanne Lanzone ("Ms. Lanzone"), individually and on behalf of her minor daughter, Gina, appeal the Lake County Court of Common Pleas judgment entered against her. For the reasons that follow, we affirm.
 {¶ 2} Statement of Facts and Procedural History
 {¶ 3} On May 26, 2006, Ms. Lanzone filed a medical malpractice action against appellees/cross-appellants, Janie M. Zart, M.D. ("Dr. Zart") and her employer, Prime Health, Inc. ("Prime Health"), and defendants, Liese Vito, M.D., Lake Hospital System, Inc. and Lake West Hospital.[1] The complaint alleged, inter alia, that the defendants failed to manage Ms. Lanzone's prenatal care and negligently and/or recklessly failed to offer Ms. Lanzone a Cesarean section ("C-section") delivery, which resulted in Gina being born with a left brachial plexus injury. Following extensive discovery and just prior to trial, Ms. Lanzone voluntarily dismissed defendants Liese Vito, M.D., Lake Hospital System, Inc. and Lake West Hospital.
 {¶ 4} Beginning on November 9, 2006, a four-day trial was held. In addition to testifying about her prenatal care, delivery, and the subsequent care and treatment for Gina, Ms. Lanzone presented the following witnesses: 1) Nancie Arsham, occupational therapist from Therapy Specialists, who testified regarding her treatment of Gina for her brachial plexus injuries; 2) Dorene A. Spak, president of Life Care Technologies, who conducted a vocational assessment of Gina; 3) Geraldine Zampini, maternal grandmother of Gina; 4) Geriann Bagdonis, Ms. Lanzone's sister; 5) Christine Gielink, Ms. Lanzone's friend who was present during the delivery; 6) economist, Dr. Harvey Rosen, who testified regarding Gina's diminished earning capacity; and 7) expert witness, Dr. Stuart Edelberg, who testified that appellee, Dr. Zart, had breached the *Page 3 
standard of care regarding informed consent. Dr. Edelberg opined that the standard of care was breached by Dr. Zart's failure to provide Ms. Lazone with informed consent regarding risks and dangers present in her pregnancy, and for failing to discuss with Ms. Lanzone the option of having a C-section delivery.
 {¶ 5} Defense counsel presented the testimony of 1) Dr. Zart, and the videotaped testimony of expert witnesses, 2) Dr. Michael Belfort, and 3) Dr. James Nocon. In essence, Dr. Zart and these expert witnesses testified that Dr. Zart did not breach the standard of care in this case.
 {¶ 6} Evidence Regarding Prenatal Care and Delivery
 {¶ 7} Ms. Lanzone began treating with Dr. Zart beginning in February of 2000. Her estimated due date was October 10, 2000. Toward the end of her pregnancy, on September 13, 2000, at 36 weeks, an ultrasound examination revealed an unusually large baby, weighing 3590 grams, placing her in the 90th percentile of weight. Because the expected growth of a baby in the final weeks of pregnancy is between 200-250 grams a week, Dr. Zart estimated that Ms. Lanzone's baby would weigh 4500 grams (approximately 10 pounds) if the pregnancy went to term.
 {¶ 8} According to the American College of Obstetrics and Gynecologists (ACOG) standards in place in 2000, a birth weight of 4500 grams for a nondiabetic mother is defined as "macrosomia," or large for gestational age, and carries with it certain inherent risks, including the risk of shoulder dystocia, which is a complication of labor and delivery in which one or both of the baby's shoulders becomes lodged behind the mother's pubic bone. More recently, the ACOG increased the birth weight to 5000 grams to be deemed macrosomia. *Page 4 
 {¶ 9} Due to the expected high birth weight, Dr. Zart decided to induce Ms. Lanzone two weeks early. On September 27, 2000, Ms. Lanzone was admitted to Lake West Hospital for induction. On the hospital admission chart, Dr. Zart noted that the estimated fetal weight was nine pounds. She also noted in three places on the hospital chart "suspected macrosomia." Dr. Zart had Ms. Lanzone sign a general informed consent form, which indicated that a C-section would be required in the event of certain serious complications. However, at no time did Dr. Zart inform Ms. Lanzone the risk of shoulder dystocia with a large birth weight baby and a vaginal delivery, nor was she offered the option of a C-section given the estimated high birth weight. Ms. Lanzone testified that had she been fully informed of the risks, she would have opted for a C-section delivery.
 {¶ 10} Subsequent to the induction of labor, Ms. Lanzone endured a long labor that included between two and one-half to three hours of pushing. During the delivery, Ms. Lanzone's baby encountered shoulder dystocia. Dr. Zart utlilized two maneuvers to free the baby's shoulders. Gina was later diagnosed with a left brachial plexus injury, and as a result, she has limited strength and function in her left arm. Gina's birth weight was 4,044 grams, or 8 pounds and 14 ounces.
 {¶ 11} Expert Testimony Regarding Liability and Informed Consent
 {¶ 12} The expert witnesses agree that when there is macrosomia, the standard of care requires the physician to discuss the risks or offer the mother the option of a C-section delivery. Thus, if the birth weight is estimated to be below 4500 grams in a non-diabetic mother, the option of a C-section need not be offered. The experts also agreed that the risk for shoulder dystocia increases with the increase in the baby's birth weight. *Page 5 
 {¶ 13} Ms. Lanzone's expert witness, Dr. Edelberg, opined that Dr. Zart breached the standard of care regarding informed consent. Dr. Edelberg interpreted Dr. Zart's notations of "suspected macrosomia" in the hospital records to mean that Dr. Zart suspected at the time of Ms. Lanzone's admission that the baby was macrosomic. Thus, according to Dr. Edelberg, Dr. Zart was required to fully inform Ms. Lanzone of all risks associated with the macrosomia so that she could make an informed decision of whether to accept the risks and proceed with a vaginal delivery or to opt for a C-section delivery.
 {¶ 14} Defense experts, Dr. Belfort and Dr. Nocon, disagreed with this interpretation and emphasized that in their opinions Dr. Zart did not breach the standard of care by failing to offer Ms. Lanzone a C-section. They based their opinions on the fact that the estimated birth weight, as recorded in the chart, was nine pounds, less than that of a macrosomic baby. In their opinions, there was no reason to offer Ms. Lanzone a C-section delivery where the estimated weight was nine pounds.
 {¶ 15} At the close of the trial, following deliberations, the jury returned a defense verdict. Ms. Lanzone filed a motion notwithstanding the verdict and a motion for a new trial, which the trial court overruled. The court found there was competent, credible evidence to support the defense verdict.
 {¶ 16} Ms. Lanzone filed the instant appeal, raising two assignments of error:
 {¶ 17} "[1.] The trial court erred to the prejudice of Plaintiffs-Appellants in denying their Motion For Judgment Notwithstanding the Verdict and/or Motion for a New Trial.
 {¶ 18} "[2.] The jury's verdict is not sustained by and is against the manifest weight of the evidence and/or contrary to law." *Page 6 
 {¶ 19} Appellees/cross-appellants, Dr. Zart and Prime Health, filed a cross-appeal, raising two assignments of error:
 {¶ 20} "[1.] The trial court incorrectly refused to permit defendants' expert witnesses to express proximate cause opinions.
 {¶ 21} "[2.] The trial court improperly excluded the testimony of Dr. Michael Noetzel."
 {¶ 22} Lack of Informed Consent
 {¶ 23} "The tort of lack of informed consent is established when: (a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any; (b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and (c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy."Nickell v. Gonzalez (1985), 17 Ohio St.3d 136, 139.
 {¶ 24} The Nickell decision established a reasonable person standard. "Under this view, the trier of fact must determine the scope of a physician's duty to disclose whether a reasonable person in the patient's position would have rejected a proposed course of treatment if the undisclosed risk had been made known to the patient by the physician." Pishotti v. Hanna, 11th Dist. No. 2002-T-0056, 2003-Ohio-4227, at ¶ 15.
 {¶ 25} The gist of Ms. Lanzone's argument regarding the lack of informed consent is that because Dr. Zart suspected that her baby fell within the definition of "macrosomia," Dr. Zart had a duty to disclose to her the inherent dangers and risks associated with macrosomia (including shoulder dystocia) and should have allowed her *Page 7 
to make an informed decision to elect to have a C-section delivery. In reaching this conclusion, Ms. Lanzone hones in on the fact that Dr. Zart noted in the hospital admission records in three places that she "suspected macrosomia."
 {¶ 26} Dr. Edelberg testified that by making this notation in the chart, Dr. Zart suspected or at least estimated that the baby's fetal weight would be at least 4500 grams (the weight deemed to be macrosomia). With this estimated birth weight, Dr. Edelberg testified that to meet the standard of care the physician must discuss the complications of macrosomia and shoulder dystocia and the option of a C-section with the patient, and that the failure to do so is a breach of the standard of care.
 {¶ 27} Dr. Zart, however, explained that by writing "suspected macrosomia" in the chart, she did not believe Ms. Lanzone had a macrosomic baby on that date. Rather, Dr. Zart testified that when she wrote these words, she meant that if Ms. Lanzone was not induced two weeks early, then the baby would become macrosomic. Dr. Zart agreed that if she actually suspected macrosomia at the time of delivery, then she had the duty to explain to Ms. Lanzone the risks. However, she believed the baby would only weigh nine pounds at birth, below the weight to be considered macrosomic, as indicated in the hospital chart.
 {¶ 28} Defense experts, Dr. Belfort and Dr. Nocon, testified that in their opinion, Dr. Zart did not breach the standard of care regarding informed consent. They both opined that there was no need to discuss the risks or options of a C-section delivery because the estimated birth weight was under 4500 grams. Specifically, when asked whether the option of a C-section delivery should have been offered to Ms. Lanzone, Dr. Nocon replied as follows: *Page 8 
 {¶ 29} "A. I would say that's irresponsible. There is no indication whatsoever for an elective Cesarean section in this patient, none so whatsoever. * * * And there is no — there was no reason to offer this woman a Cesarean section and it is unethical to offer a patient an operative delivery that is not indicated so it was not indicated and there was no reason to offer it."
 {¶ 30} Dr. Belfort also agreed with this conclusion, as demonstrated by the following response:
 {¶ 31} "Q. Do you believe Dr. Zart met the standard of care by not offering a C section in this case?
 {¶ 32} "A. Yes."
 {¶ 33} In this respect, we disagree with Ms. Lanzone's assertion that "all of the medical experts confirm that Zart breached the acceptable standard of care, * * * by not advising Plaintiff of the risks of the vaginal delivery and by not explaining the benefits of a C-section delivery." Ms. Lanzone focuses on selective portions of the experts' testimony in an attempt to support her view that they confirmed the fact that Dr. Zart breached the standard of care in this case. For instance, Ms. Lanzone points to the fact that Dr. Belfort conceded that, "in a case such as this one, the patient should be advised of all the risks and benefits of a vaginal delivery." However, upon closer examination, we find that this response was in answer to a general question and is taken out of context. When rendering their ultimate opinions, Dr. Belfort and Dr. Nocon found no breach of the standard of care regarding Dr. Zart's decision not to offer Ms. Lanzone the choice to have an elective C-section.
 {¶ 34} With regard to the issue of informed consent as it pertains to the failure by Dr. Zart to explain the risks associated with macrosomia, including the risk of shoulder *Page 9 
dystocia, Ms. Lanzone again makes the blanket statement that "[t]he testimony of all the standard of care experts that testified confirmed and likewise established that Defendant Zart had a duty to disclose the material risks and dangers with Ms. Lanzone as Zart `suspected' Gina to become macrosomic or `unusually large.'" Ms. Lanzone also contends that both defense experts recanted their direct examination testimony during cross-examination and testified that Dr. Zart breached the standard of care in this case.
 {¶ 35} Ms. Lanzone argues that the following response by Dr. Nocon is indicative of her belief that Dr. Zart ignored a warning sign that she was carrying a macrosomic baby and failed to inform her that the baby was at high risk for shoulder dystocia:
 {¶ 36} "Q. Now, Doctor, do you agree with me that prior to admitting Mrs. Lanzone to the hospital that Dr. Zart knew that the baby was at risk in encountering shoulder dystocia based upon her testimony, correct?
 {¶ 37} "A. Yes.
 {¶ 38} "Q. And you would agree with me that Dr. Zart saw a warning sign specifically that this baby was suspected to be macrosomic and that * * * the baby was at high risk for shoulder dystocia, correct?
 {¶ 39} "A. Yeah."
 {¶ 40} Although Dr. Nocon answered these questions in this manner, he did not find a breach of the standard of care as Ms. Lanzone asserts. Rather, he expressly stated that Dr. Zart had no obligation to discuss the possible risk factors for shoulder dystocia:
 {¶ 41} "Q. Now, Doctor, would you agree with me that Dr. Zart had an obligation to discuss with Mrs. Lanzone any risks associated with shoulder dystocia, correct? *Page 10 
 {¶ 42} "A. I don't see any indication that there were any clear risk factors for shoulder dystocia in this case. And Dr. Zart had no obligation to discuss * * * risk factors and issues that are not pertinent to this situation."
 {¶ 43} Dr. Nocon reiterated that although a physician, generally speaking, has an obligation to discuss these risks, "in that context * * * it is reasonable to give the mom as much information as you can." However, he said there was no obligation to do so in this case.
 {¶ 44} With regard to Dr. Belfort, Ms. Lanzone points to the following line of questioning to support her position that Dr. Zart breached the standard of care:
 {¶ 45} "Q. Now, Doctor, you'd agree with me, would you not, that if there were serious consequences to either the patient or the patient's baby, you would consider it appropriate and within the acceptable standard of care to discuss those things with the patient, correct?
 {¶ 46} "A. Correct. * * *
 {¶ 47} "Q. And if a doctor did not discuss those things, he or she would be breaching the acceptable standard of care?
 {¶ 48} "A. Yes."
 {¶ 49} Because Dr. Nocon agreed that shoulder dystocia is a known risk for a baby with suspected macrosomia, Ms. Lanzone maintains that Dr. Belfort confirmed that Dr. Zart had breached the standard of care. However, Dr. Belfort, when specifically asked questions pertaining to Ms. Lanzone's delivery, unequivocally said there was no breach of the standard of care: *Page 11 
 {¶ 50} "Q. You'd agree with me that Dr. Zart should have discussed the risks of macrosomia and the complications of the shoulder dystocia with Mrs. Lanzone; yes or no?
 {¶ 51} "A. No."
 {¶ 52} With this testimony in mind, we now turn to the issue of whether the trial court erred in denying Ms. Lanzone's motion for judgment notwithstanding the verdict ("JNOV") and/or for a new trial. In her first assignment of error, Ms. Lanzone contends that the trial court erred in overruling her motion for JNOV or for a new trial. She maintains that the evidence established that Dr. Zart breached the standard of care by failing to provide her with adequate information to allow her to make an informed decision on whether to elect to have a C-section rather than a vaginal delivery.
 {¶ 53} Judgment Notwithstanding the Verdict
 {¶ 54} "A motion for judgment notwithstanding the verdict is reviewed under the same standard as that of a motion for a directed verdict."Marks v. Swartz, 11th Dist. No. 2007-T-0008, 2007-Ohio-6009, at ¶ 25, citing Texler v. D.O. Summers Cleaners Shirt Laundry Co. (1998),81 Ohio St.3d 677, 679; see, also, Blatnik v. Dennison,148 Ohio App.3d 494, 504, 2002-Ohio-1682.
 {¶ 55} Thus, where a party seeks JNOV, "[t]he evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling *Page 12 
upon either of the above motions." Posin v. A.B.C. Motor CourtHotel (1976), 45 Ohio St. 2d 271, 275.
 {¶ 56} We review a trial court's ruling on a JNOV de novo.Blatnik at 504. "[A] motion for * * * judgment notwithstanding the verdict does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and consider the evidence." Id., citing O'Day v. Webb (1972), 29 Ohio St. 2d 215, paragraph three of the syllabus.
 {¶ 57} We reiterate that, "in ruling upon a motion for a directed verdict [or JNOV], a trial court cannot weigh the evidence which has been presented by the plaintiff; nor can the trial court consider the credibility of the plaintiff's witnesses. Instead, the trial court must simply determine whether the plaintiff has submitted some evidence going to each of the essential elements of her claim." DiSilvestro v.Quinn (Dec. 31, 1996), 11th Dist. No. 95-L-061, 1996 Ohio App. LEXIS 5950, 6.
 {¶ 58} Furthermore, "[i]n reviewing the propriety of motions for a directed verdict, the appellate courts of this state have indicated that the fact that the testimony of an expert witness has been tested during cross-examination does not warrant the granting of such a motion unless the expert contradicts or recants his testimony." Id. at 17-18, citingNichols v. Hanzel, 4th Dist. No. 94CA2316, 1996 Ohio App. LEXIS 1743. "Once an expert properly states his professional opinion to a properly formed question as to probability, `he * * * has established a prima facie case as a matter of law. Erosion of that opinion due to effective cross-examination does not negate that opinion, rather it only goes to weight and credibility. Thus, it would not usually be a suitable instance for application of a directed verdict. The exception would be when the expert actually *Page 13 
recants the opinion on cross.'" Celmer v. Rodgers, 11th Dist. No. 2004-T-0074, 2005-Ohio-7054, at ¶ 35, citing Galletti v. BurnsIntl. (1991), 74 Ohio App.3d 680, 684.
 {¶ 59} In order to prove a claim of medical malpractice, "a plaintiff must satisfy four basic elements: (1) the existence of a duty owed to the plaintiff by the physician; (2) a breach of this duty by the physician; (3) a showing of the probability that the breach was a proximate cause of the harm to the plaintiff; and (4) damages."DiSilvestro at 6-7, citing Stinson v. England (1994),69 Ohio St. 3d 451. "A plaintiff is required to present expert testimony in order to demonstrate that the actions of a physician fell below the standard of care and that this breach was the cause of the injuries sustained."Perla v. Cleveland Clinic Found., 8th Dist. No. 83058, 2004-Ohio-2156, at ¶ 7, citing Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, at 131-132.
 {¶ 60} Contrary to Ms. Lanzone's position, in this case there is conflicting expert testimony as between Dr. Edelberg and defense experts, Dr. Nocon and Dr. Belfort, regarding whether Dr. Zart breached the standard of care. While "[i]t is true that the trial court is required to `give the nonmoving party the benefit of all reasonable inferences that may be drawn from the evidence,' * * * it is only `[w]hen there is sufficient credible evidence to permit reasonable minds to reach different conclusions on an essential issue, the trial court must submit that issue to the jury.'" Bliss v. Chandler, 11th Dist. No. 2006-G-2742, 2007-Ohio-6161, at ¶ 64, citing O'Day at paragraph four of the syllabus.
 {¶ 61} As applied to the instant case, we find that there is sufficient credible evidence to permit reasonable minds to reach different conclusions on the issue of whether Dr. Zart breached the standard of care. Although Dr. Edelberg opined that Dr. Zart breached the standard of care by failing to offer Ms. Lanzone the option of a C- *Page 14 
section delivery and by failing to inform her of the risk of shoulder dystocia with a macrosomic baby, the defense experts found no such breach. To begin with, because Dr. Zart noted in the admission records that the fetal weight was estimated to be nine pounds, the defense experts did not believe the baby was thought to be macrosomic regardless of Dr. Zart's notations in the chart referencing "suspected macrosomia." In Dr. Nocon and Dr. Belfort's opinions, an estimated birth weight of nine pounds falls below the definition of macrosomia; thus, under these circumstances, the standard of care does not require a discussion of elective C-section delivery or the risk of shoulder dystocia.
 {¶ 62} Because the evidence is susceptible to more than one interpretation regarding the issue of informed consent, we find that the trial court was warranted in denying Ms. Lanzone's motion for JNOV.
 {¶ 63} We further find that neither Dr. Belfort nor Dr. Nocon recanted their expert opinions during cross-examination. Although they agreed in general terms with some of the questions posed regarding the standard of care and under what circumstances it is appropriate to offer a C-section or discuss the risk of shoulder dystocia, they remained steadfast in their opinions that in this particular case the standard of care was met. What Ms. Lanzone has attempted to do is to selectively choose portions of these doctors' testimony to support her position. However, when read in its entirety, their testimony, albeit tested by effective cross-examination, is not tantamount to a recantation. SeeCelmer at ¶ 35.
 {¶ 64} Under these circumstances, we find Ms. Lanzone's motion for JNOV was properly denied.
 {¶ 65} New Trial *Page 15 
 {¶ 66} Ms. Lanzone further asserts that she was entitled to a new trial. "This court reviews a trial court's judgment on a Civ.R. 59 motion for new trial under the abuse of discretion standard."Effingham v. XP3 Corp., 11th Dist. No. 2006-P-0083, 2007-Ohio-7135, at ¶ 18. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." (Citations omitted.) Id., citingBlakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 67} Thus, in reviewing a motion for a new trial we do so with deference to the trial court's decision, recognizing that "the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the `surrounding circumstances and atmosphere of the trial.'" Kitchen v. Wickliffe Country Place (July 13, 2001), 11th Dist. No. 2000-L-051, 2001 Ohio App. LEXIS 3191, at 8, quotingMalone v. Courtyard by Marriott L.P. (1996), 74 Ohio St. 3d 440, 448.
 {¶ 68} "`In deciding a motion for a new trial based on the weight of the evidence, the trial court must weigh the evidence and pass upon the credibility of witnesses. However, the trial court's weighing of the evidence differs from that of the jury in that it is restricted to determining whether manifest injustice has been done and whether the verdict is, therefore, manifestly against the weight of the evidence.The court may not set aside a verdict on the weight of the evidencesimply because its opinion differs from the jury's opinion.'" (Citation omitted and emphasis added.) Id. at *8-9, quoting Charter Express, Inc.v. Indep. Ins. Serv. Corp. (Apr. 10, 1992), 11th Dist. No. 91-P-2296, 1992 Ohio App. LEXIS 1926.
 {¶ 69} We therefore examine a motion for a new trial to see if the jury's verdict is supported by competent, substantial, and credible evidence. "[W]here the evidence is *Page 16 
susceptible to more than one construction, a reviewing court is bound to give the evidence the interpretation most consistent with the verdict and judgment." Id. at *9, citing Seasons Coal Co. v. Cleveland (1984),10 Ohio St. 3d 77, 80.
 {¶ 70} Because this case involves differing interpretations and opinions between the expert witnesses regarding whether Dr. Zart did or did not breach the standard of care, the matter ultimately involves the credibility of these witnesses. As the trier of fact, the jury was free to find Dr. Zart's testimony and the opinions of Dr. Nocon and Dr. Belfort more credible than that of Dr. Edelberg. We find that there was competent, substantial, and credible evidence presented to support the jury's verdict. The trial court did not abuse its discretion in denying Ms. Lanzone's motion for a new trial.
 {¶ 71} Ms. Lanzone's first assignment of error is overruled.
 {¶ 72} Manifest Weight of the Evidence
 {¶ 73} In her second assignment of error, Ms. Lanzone challenges the trial court's verdict on the ground that it is against the manifest weight of the evidence.
 {¶ 74} When reviewing a trial court's decision on a manifest weight of the evidence basis, an appellate court is guided by the presumption that the findings of the trial court were correct. Seasons Coal Co., Inc. v.Cleveland (1984), 10 Ohio St.3d 77, 80; In re Williams, 10th Dist. Nos. 01AP-867 and 01AP-868, 2002 Ohio 2902, at ¶ 7. The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflections, and gestures, and may use these observations in assessing the credibility of the testimony. In re Memic, 11th Dist. Nos. 2006-L-049, 2006-L-050 and 2006-L-051, 2006-Ohio-6346, at ¶ 21, citingSeasons Coal at 80. Accordingly, "judgments which are supported by some competent, credible evidence will not be reversed by a reviewing court as being *Page 17 
against the manifest weight of the evidence. C.E. Morris Co. v. FoleyConstr Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, at syllabus."Grange Mut. Cas. Co. v. Tackett, 11th Dist. No. 2007-P-0037,2008-Ohio-631, at ¶ 76.
 {¶ 75} In this case, Ms. Lanzone's theory was that Dr. Zart suspected macrosomia, as documented in the hospital records, and, therefore, she had a duty to fully inform her of the risks of macrosomia (including shoulder dystocia) and to offer her an elective C-section. For support, Dr. Edelberg testified that Dr. Zart breached the standard of care regarding informed consent.
 {¶ 76} However, competent, credible evidence was presented on behalf of the defense to support their position that there was no breach of the standard of care. While Dr. Zart conceded that she wrote "suspected macrosomia" in the hospital chart, she offered an explanation as to what she meant by the phrase. Dr. Zart testified that she suspected the baby would become macrosomic if she did not induce Ms. Lanzone two weeks prior to her due date, but she did not believe the baby would be macrosomic on the date she was delivered. Dr. Zart further testified that she anticipated the baby's birth weight would be nine pounds and documented this in the admission records. Thus, because she did not believe the baby would be macrosomic, she did not believe it was necessary to discuss the risk of shoulder dystocia or to offer Ms. Lanzone a C-section.
 {¶ 77} Both Dr. Nocon and Dr. Belfort opined that with an estimated birth weight of nine pounds, the baby was not macrosomic. Under these circumstances, they testified that it was not the standard of care for a physician to offer a C-section to a mother carrying a nine-pound baby or to offer her a C-section delivery. *Page 18 
 {¶ 78} The jury was free to evaluate the credibility of the witnesses and to determine what testimony was more credible. Bailey v.Pochedly, 11th Dist. No. 2004-T-0037, 2005-Ohio-3087, at ¶ 37. Because the decision of the trial court was supported by competent and credible evidence, we find that the judgment was not against the manifest weight of the evidence.
 {¶ 79} Ms. Lanzone's second assignment of error is without merit.
 {¶ 80} Cross-Appeal
 {¶ 81} Appellees filed a cross-appeal regarding certain evidentiary rulings made by the trial court. Appellees ask us to consider two assignments of error regarding limitations placed upon or exclusion of defense experts' testimony in the event we reversed the trial court's decision. However, because we find no merit in Ms. Lanzone's appeal, we dismiss the cross-appeal on the ground that these arguments are rendered moot by our decision.
 {¶ 82} The judgment of the Lake County Court of Common Pleas is affirmed.
 {¶ 83} The cross-appeal is dismissed.
CYNTHIA WESTCOTT RICE, J., COLLEEN MARY O'TOOLE, J., concur.
[1] This lawsuit was re-filed after a voluntary dismissal. *Page 1