OPINION
{¶ 1} Dale Charles Pete Eilers, dba Eilers Trade, and LGC Bay County, LLC, c/o Registered Agent Dale C. Eilers (hereafter collectively "Mr. Eilers"), appeal from a judgment of the Lake County Court of Common Pleas denying Mr. Eilers' Motion for Judgment Notwithstanding the Verdict and/or Motion for New Trial, after a jury awarded damages to WRG Services Inc. ("WRG") in a contract dispute. For the following reasons, we affirm. *Page 2 
 {¶ 2} Procedural History
 {¶ 3} On November 22, 2006, WRG filed a complaint against Mr. Eilers in the Lake County Court of Common Pleas alleging he breached several written agreements with WRG to use its ATM transaction processing services. Mr. Eilers filed an answer and a counterclaim. He also filed a motion to transfer venue, arguing one of the contracts specified jurisdiction and venue in Cuyahoga County, Ohio. The trial court denied the motion and the matter proceeded to a jury trial on January 8, 2008. The jury returned a verdict awarding WGR damages in the amount $17,238.05 and in favor of WRG regarding Mr. Eilers' counterclaim.
 {¶ 4} Mr. Eilers filed a Motion for Judgment Notwithstanding the Verdict and/or Motion for New Trial. The trial court denied that motion, and Mr. Eilers filed the instant appeal from that judgment and from the court's judgment denying his request to transfer venue. The record reflects the following facts pertinent to this appeal.
 {¶ 5} WRG's ATM Transaction Processing Services
 {¶ 6} WRG, a Willoughby, Ohio company, is in the automated teller machine ("ATM") business. WRG has two separate lines of business: (1) it makes and sells ATMs, and (2) it offers services to process ATM transactions. In its latter capacity, WRG is referred to an "independent sales organization," or ISO.
 {¶ 7} WRG has three hundred independent "distributors" throughout the country. These distributors either: (1) sell ATMs for WRG, (2) obtain transaction processing services contracts for WRG, or (3) own their own ATMs and contract with WRG to use its transaction processing services. Mr. Eilers, a sole proprietor located in *Page 3 
Panama City, Florida, was one of its distributors, and this case involves the contracts he signed to use WRG's transaction processing services for the three ATMs he owned.
 {¶ 8} An ISO such as WRG establishes its ATMs (i.e., the ATMs it processes) at a merchant's location, such as a gas station or a convenient store, in several different ways. WRG may sell an ATM outright to a merchant; or, WRG's distributors may solicit transaction processing services on its behalf for an ATM in a merchant's location. In Mr. Eilers' case, he had his own ATMs which he placed in several locations and then contracted with WRG for its transaction processing services.
 {¶ 9} WRG is not a bank. In order to process the ATM transactions, it utilizes the service of a bank to "sponsor" its ATMs within the "banking networks" such as Visa or MasterCard. In addition to utilizing the service of a sponsor bank and the banking networks, WRG also utilizes the services of a transaction processor, which receives and decodes transmissions from the ATMs and routes each transaction to a proper destination, such as the bank that issued the ATM card. The transmission would include information regarding the personal identification number (PIN) and the account balance in the card. If the PIN matches the card and funds are available, an approval is sent back to the transaction processor, which in turn routes the transaction back to the ATM, which would then dispense cash.
 {¶ 10} WRG pays its sponsor bank on a per-transaction basis. It is also responsible to the sponsor bank for all the ATMs for which WRG provides transaction processing services. In addition, WRG pays an annual sponsorship fee to each banking network such as VISA or Mastercard. WRG also pays the transaction processor for its transmission service. *Page 4 
 {¶ 11} WRG's revenues consist of two components: the "surcharge" revenue and the "network" revenue. The "surcharge" is a fee that a user pays to use an ATM. The "surcharge" is how a distributor such as Mr. Eilers makes money from an ATM. It comes out of a user's bank or credit card account. WRG collects these surcharge fees on behalf of the distributor and passes them on to the distributor, paid on a monthly basis. The distributor is free to keep all of the surcharge revenue or to share a portion of it with the merchant where the ATM is located. Because the surcharge is the profit that belongs to the distributor, the distributor determines how much surcharge an ATM at a particular location would charge. The fee ranges from $0.00 to $9.99, the industry standard being between $1.50 and $2.00.
 {¶ 12} The second revenue component for WRG is the "interchange" it collects from an ATM network such as Visa or MasterCard, American Express, or dozens of other national and regional networks. This is its network revenue and this is how WRG makes money from its ATM transaction processing business. An ATM network such as Visa or MasterCard pays interchange to WRG in exchange for WRG's ATMs accepting the card it issues. The interchange rates paid by the ATM networks differ. The average interchange a network pays to an ISO for each ATM transaction is $0.43. The collection of the interchange, i.e., the network revenue, is how WRG profits from its ATM transaction processing services.
 {¶ 13} The Merchant Processing Agreements at Issue
 {¶ 14} Mr. Eilers owned three ATMs which utilized WRG's ATM transaction processing services, all located in Florida. The instant lawsuit concerns these three ATMs. To use WRG's transaction processing services for these ATMs, Mr. Eilers *Page 5 
entered into three contracts, called "Merchant Processing Agreement," with WRG: (1) a contract placing an ATM at Bingo Palace dated January 1, 2001 (`the Bingo Palace contract"); (2) a contract placing an ATM at Calloway Bingo dated October 1, 2002 ("the Calloway Bingo contract"); and (3) the contract placing an ATM at Smok's Tobacco Outlet dated March 29, 2003 ("the Smok's contract"). These contracts were for a duration of five years, which is the industry standard for this type of contract, and renewable for another five years at the end of the term.
 {¶ 15} Each of these contracts contains an identical clause regarding surcharge revenue and network revenue. For each of these ATMs, Mr. Eilers had decided to charge a user a surcharge of $2.49. The clause provided:
 {¶ 16} "A customer surcharge of $2.49 shall be assessed at the location referenced on qualified ATM transactions (approved cash withdrawals). This surcharge shall be collected by [WRG] along with any other network revenues. [WRG] shall rebate to the merchant surchargerevenue less expenses referenced above in the merchant agreement or site agreement (location contract) by the 20th of each succeeding month. All other network revenues shall remain the sole property of [WRG]." (Emphasis added.)
 {¶ 17} In 2004, Mr. Eilers received a total of $37,960.87 from WRG in surcharge income for his three ATMs, based on $2.49 per transaction; in 2005, he received $30,214.32.
 {¶ 18} The contracts called for Mr. Eilers to pay WRG a nominal monthly "access" fee of $25. This is the only fee that a distributor such as Mr. Eilers pays WRG for using WRG's transaction processing services. *Page 6 
 {¶ 19} The instant appeal concerns the damage provision in these contracts. The Calloway Bingo contract and the Smok's contract contain the following damage clause:
 {¶ 20} "If this agreement is terminated without cause by Merchant prior to expiration of the original term, [WRG] shall be specifically authorized to retain the last sixty (60) days surcharge revenue as reimbursement for its initial set up expense, in addition to any otherdamages or lost income caused it by such early termination." (Emphasis added.)
 {¶ 21} The Bingo Palace contract contains a termination clause identical to the above clause except that the last phrase in the clause reads: "in addition to any other damages caused it by such early termination."
 {¶ 22} The record also contains a Distributor Processing Agreement dated April 1, 2003, signed by Mr. Eilers after he contracted with WRG for the three ATMs. This document specifically referenced interchange revenue. The agreement provided that for any future transaction processing contracts Mr. Eilers would bring to WRG, he would receive interchange of between ten cents to twenty-five cents for each approved cash withdrawal, the amount dependent on the total number of ATMs he would have under contracts with WRG.
 {¶ 23} In December of 2005, Bingo Palace and Calloway Bingo went out of business. Also around that time, WRG discovered all three of Mr. Eilers' ATMs went "off-line," that is, were no longer having their transactions processed by WRG.
 {¶ 24} On February 4, 2006, Mr. Eilers faxed a correspondence to WRG terminating all three contracts with WRG. On June 30, 2006, WRG sent a *Page 7 
correspondence to Mr. Eilers advising him of his liability under the three contracts from his early termination of the contracts. WRG calculated its damages based on the number of transactions each ATM generated for its last full year. For each ATM, that number was divided by twelve to arrive at its estimate of an average monthly volume for the remaining contract period. The damages for each contract included (1) the monthly $25 access fees Mr. Eilers was to pay WRG for the remaining months in the contract, (2) the sixty-day surcharge revenue, based on the average monthly volume that the contract allows WRG to retain in the event of an early termination, and (3) the interchange, or network, revenue, based on the network average of $.043 per transaction that WRG would have collected from the various networks for the remaining months in the contract. WRG calculated its damages to be $8,313.58 for the Calloway Bingo contract; $16,024.44 for the Bingo Palace contract; and $2,089.17 for the Smok's contract. The amount of damages totaled $26,427.19.
 {¶ 25} Having received no response from Mr. Eilers, WRG sent the correspondence again on August 21, 2006 and on September 29, 2006. It subsequently filed the instant complaint alleging Mr. Eilers breached the contracts and sought damages in the amount of $26,427.19. Mr. Eilers filed a counterclaim, contending WRG breached a verbal agreement to provide technical support to Mr. Eilers to maintain his ATMs. Mr. Eilers also filed a motion to transfer venue, contending the Bingo Palace contract specified jurisdiction and venue to be in Cuyahoga County, Ohio. The trial court denied the motion and the case proceeded to a jury trial.
 {¶ 26} Jason Kuhn, a vice president of WRG, testified regarding the nature of WRG's business. He described the surcharge revenue and interchange revenue, *Page 8 
explaining a network pays interchange an ISO such as WRG for each transaction in exchange for the ISO's ATMs accepting the card issued by the network. He testified that the interchange revenue averages $0.43 per transaction.
 {¶ 27} Mr. Kuhn also testified that when the placement of an ATM with a merchant did not work out, a distributor was obligated to place the ATM in a new location so that the ATM would continue to generate revenue. Mr. Kuhn also explained that WRG charges a distributor $25 monthly access fee to help offset the cost of the annual network sponsorship fees WRG pays to network banks.
 {¶ 28} The plaintiffs counsel called Mr. Eilers to testify on cross-examination. Mr. Eilers stated he currently had six ATMs in the field and all six machines used Money Tree, a competitor of WRG, for transaction processing services.
 {¶ 29} For the defense, Mr. Eilers testified that he had problems getting technical support from WRG to maintain his ATMs. He testified it was difficult to work with WRG's personnel, who were rude and insulting. He stated it was impossible to operate his ATMs under those conditions. He also stated that Bingo Palace and Calloway Bingo went out of business in December 2005, and that the ATM placed at Smoks' broke down around the same time.
 {¶ 30} Mr. Eilers testified he did not know WRG was making $0.43 on each ATM transaction. He thought that the $25 monthly fee was the total amount that WRG was compensated for the transaction processing services it provided to the ATMs. He stated he signed the Merchant Processing Agreements without reading them.
 {¶ 31} Following trial, the jury awarded WRG $17,283.05 in damages, and also returned a verdict in WRG's favor on Mr. Eilers' counterclaim. The jury awarded WRG *Page 9 
most of its damages requested. The award included: (1) the $25 monthly access fee for the remaining months under the contracts, and (2) the sixty-day surcharge revenue WRG was allowed to retain in the event of an early termination. The amount of award, however, reflects that the jury awarded 100% of the interchange revenue WRG would have collected for the remaining months under the Smoks' contracts, but reduced WRG's interchange revenue by 50% for the two bingo halls closed in December of 2005.
 {¶ 32} Mr. Eilers filed a Motion for Judgment Notwithstanding the Verdict and/or Motion for New Trial. His motion for a new trial was based on Civ. R. 59 (A)(5) and (A)(6). It alleged that the jury's award was erroneous and against the manifest weight of evidence. The trial court denied Mr. Eilers' motion.[1]
 {¶ 33} Mr. Eilers now appeals from that judgment and also the trial court's judgment denying his motion to transfer venue, raising two assignments of error for our review:
 {¶ 34} "[1.] The trial court erred in overruling appellant's motion for judgment notwithstanding the verdict or for a new trial and entering judgment on the jury's verdict.
 {¶ 35} "[2.] The trial court erred by exercising jurisdiction over the merchant processing agreement covering Bingo Palace (Plaintiff's Exhibit 5), which specified that Cuyahoga County has sole and exclusive jurisdiction over disputes arising from that agreement."
 {¶ 36} In his first assignment of error, Mr. Eilers argues that WRG should not be *Page 10 
entitled to the loss of the interchange revenue because the nature and amount of the lost profits are not specified in the contract and he was not aware of these profits made by WRG when he entered into the contracts to become WRG's distributor.
 {¶ 37} Standard of Review for JNOV and for a New Trial
 {¶ 38} We review a trial court's ruling on motion for judgment notwithstanding the verdict ("JNOV") de novo. See Lanzone v. Zart, 11th Dist. No. 2007-L-073, 2008-Ohio-1496, ¶ 56.
 {¶ 39} "[W]here a party seeks JNOV, `[t]he evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions.'" Id. at ¶ 55, quoting Posin v. A.B.C. Motor Court Hotel (1976),45 Ohio St. 2d 271, 275, 344 N.E.2d 334."
 {¶ 40} Regarding a motion for a new trial pursuant to Civ. R. 59, a court of appeals reviews a trial court's judgment on a Civ. R. 59 motion for a new trial under the abuse of discretion standard. Effingham v. XP3Corp., 11th Dist. No. 2006-P-0083, 2007-Ohio-7135, at ¶ 18. The granting of a motion for a new trial rests within the sound discretion of the trial court and will not be disturbed upon appeal unless there has been an abuse of discretion. Pena v. Northeast Ohio Emergency Affiliates,Inc. (1995), 108 Ohio App.3d 96, 103. See, also, Rohde v. Farmer (1970),23 Ohio St.2d 82, paragraph one of the syllabus (where a trial court is authorized to grant a new trial for a reason *Page 11 
which requires the exercise of sound discretion, the order granting a new trial may be reversed only upon a showing of abuse of discretion by the trial court). "The term abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 41} Lost Profits
 {¶ 42} In a breach of contract case, a damage award may include costs and lost profits. Jaric, Inc. v. Chakroff (1989), 63 Ohio App.3d 506,520.
 {¶ 43} The law regarding the recovery of lost profits is well-settled in Ohio. "[L]ost profits may be recovered by the plaintiff in a breach of contract action if: profits were within the contemplation of the parties at the time the contract was made, the loss of profits is the probable result of the breach of contract, and the profits are not remote and speculative and may be shown with reasonable certainty."Charles R. Combs Trucking, Inc. v. Int'l. Harvester Co. (1984),12 Ohio St. 3d 241, 244.
 {¶ 44} Furthermore, "[t]he determination of the existence and amount of the lost profits is a question of fact." Kosier v. DeRosa,169 Ohio App.3d 150, 2006-Ohio-5114 at ¶ 33, citing Bowlander v. Bowlander (Apr. 7, 1995), 6th Dist. No. OT-93-50, 1995 Ohio App. LEXIS 1474.
 {¶ 45} The evidence in this case reflects that Mr. Eilers entered into contracts with WRG to have WRG provide transaction processing services for three ATMs he owned. He paid a nominal $25 dollars access fee per month to WRG in exchange for WRG's services. In return, he received from WRG surcharge revenue based on a surcharge of $2.49 charged to a user each time a credit or debit card was used in his *Page 12 
ATMs. The surcharge came out of the card holder's bank account and was collected by WRG and paid to him on a monthly basis. For the three ATMs he placed in service, Mr. Eilers received a total of $37,960.87 for 2004 and $30,214.32 for 2005 from WRG.
 {¶ 46} WRG, for transaction processing services, derives most of its income from interchange paid by networks such as Visa or MasterCard. Every time a card holder uses a WRG-processed ATM, the network would pay an interchange to WRG in exchange for the ATM's acceptance of the network's card. The average interchange per transaction is $0.43.
 {¶ 47} Mr. Eilers does not seem to dispute that the loss of WRG's interchange revenue was a probable result of his breach of contract. He alleges, however, that he was not aware of these profits when he entered into the contracts with WRG. He essentially claims that the lost profits were not within the contemplation of the parties at the time the contract was made.
 {¶ 48} Evidence Regarding Whether Lost Profits Were Within theParties' Contemplation
 {¶ 49} Regarding this issue, the record shows that the termination and damage clause of the contracts between Mr. Eilers and WRG provided that in the event of a termination without cause prior to the expiration of the five year contract term, WRG will retain the sixty days of surcharge revenue "in addition to any other damages or lost income caused it by such early termination."
 {¶ 50} Furthermore, despite Mr. Eilers' claim that there was no reference in the contracts to the interchange revenue collected by WRG from the networks, the contracts did mention this revenue, referring to it as "network" revenue. This reference occurs in the "surcharge clause." That clause, identical in each contract, stated: "A *Page 13 
customer surcharge of $2.49 shall be assessed * * *. This surcharge shall be collected by [WRG] along with any other network revenues. [WRG] shall rebate to the merchant surcharge revenue less expenses referenced above in the merchant agreement or site agreement (location contract) by the 20th of each succeeding month. All other network revenues shall remain the sole property of [WRG]." (Emphasis added.)
 {¶ 51} The evidence also shows that subsequent to the execution of these contracts, Mr. Eilers signed a "Distributor Processing Agreement," which provided incentives for Mr. Eilers to use WRG for its transaction processing services for any other ATMs he may own. The agreement specifically provided WRG would share a portion of the interchange it collects for each approved cash withdrawal with the distributor, the amount to be shared dependent on the number of ATMs a distributor put under contracts with WRG.
 {¶ 52} Despite the evidence showing express contractual provisions for a distributor's liability for lost profits, a specific reference to "network" revenue in the contracts, and his awareness of interchange revenue sharing offered by WRG as an incentive for future contracts, Mr. Eilers testified, however, that he had no knowledge that WRG was making profits by way of interchange collected from the networks, and that the first time he learned of WRG's interchange revenue was when WRG sent him correspondence notifying him of its damages due to his breach of the contracts.
 {¶ 53} Thus, on the issue of whether the lost interchange revenue was within the parties' contemplation at the time of the contracts, the jury had before it Mr. Eilers' testimony that he had no knowledge of any interchange revenue on the one hand, and on the other hand, evidence presented by WRG, which includes the various contractual *Page 14 
provisions as well as the fact that Mr. Eilers, as a distributor, made over $30,000 a year from its contracts with WRG, while WRG collected a mere $300 in fees a year from him for the processing services it provided, a fact that could call into doubt Mr. Eilers' claim that he did not know that WRG profited from another source of revenue.
 {¶ 54} Evidence Regarding Reasonable Certainty
 {¶ 55} The record also reflects substantial evidence presented by WRG to show that the interchange revenue was not remote and speculative and may be demonstrated with reasonable certainty. WRG calculated its damage of lost interchange, or network, revenue based on a network average of $0.43 per transaction, as testified to by its vice president. This is the amount a network would pay WRG each time a consumer uses a card issued by that network to withdraw cash from an ATM. For each ATM owned by Mr. Eilers, WRG took the total number of transactions the ATM generated for its last full year and divided it by twelve for an estimate of the average monthly volume for the particular ATM. This number was then multiplied by $0.43 to arrive at the monthly interchange revenue, which was in turn multiplied by the remaining months in the contract for the total interchange revenue WRG estimated it would have collected for each contract if Mr. Eilers had not breached the contract. On the basis of these calculations, WRG sought $5,846.28 for the lost interchange revenue under the Calloway Gingo contract, $12,642.00 under the Bingo Palace contract, and $1,137.78 under the Somk's contract. Thus, WRG presented substantial evidence to the jury to establish that the profits it lost were not remote or speculative and could be shown with reasonable certainty. *Page 15 
 {¶ 56} Based on the entirety of evidence presented at trial, we therefore conclude the trial court properly denied Mr. Eilers' motion for JNOV, because, construing the evidence most strongly in favor of WRG, there was substantial evidence to support WRG's claim of lost profits, upon which reasonable minds may reach different conclusions.
 {¶ 57} As the record reflects evidence going to all the elements of WRG's claim of lost profits, and because the existence and amount of lost profits is a question of fact, the trial court correctly deferred to the jury in its determination on this issue and denied Mr. Eilers' motion for JNOV.
 {¶ 58} Likewise the trial court did not abuse its discretion in denying Mr. Eilers' motion for a new trial. WRG presented evidence to demonstrate an ISO such as itself profits in its business offering ATM transaction processing services primarily from its collection of interchange revenue from the networks. WRG also presented evidence to show its lost interchange revenue was not remote or speculative, but could be calculated with reasonable certainty. The jury returned a verdict awarding WRG its estimated lost interchange revenue under the Smok's contract, but only 50% of the lost interchange revenue under the Calloway Bingo and the Bingo Palace contracts, apparently because these bingo halls went out of business necessitating a redeployment of those two ATMs. Given this record and the jury verdict, we find no abuse of discretion by the trial court denying Mr. Eilers' motion for a new trial.
 {¶ 59} Mr. Eilers' first assignment of error is overruled.
 {¶ 60} Venue *Page 16 
 {¶ 61} In his second assignment of error, Mr. Eilers claims the Lake County Court of Common Pleas erred by exercising "jurisdiction" over the dispute involving the Bingo Palace contract, which specified that Cuyahoga County, Ohio "has sole and exclusive jurisdiction and venue" for any disputes relating to the contract.
 {¶ 62} The record indicates that the Bingo Palace contract, signed on January 1, 2001, provided that the venue for disputes arising from the contract was proper in Cuyahoga County, Ohio, where WRG's office was located at the time, while the subsequent two contracts, the Calloway Bingo contract and the Smok's contract specified Lake County, Ohio, as the venue.
 {¶ 63} Mr. Eilers filed a "Motion of Defendants to Transfer Venue," asking the court to transfer venue to the Court of Common Pleas of Cuyahoga County, Ohio, pursuant to Civ. R. 3. Mr. Eilers stated the ground for the request was the forum selection clause in the Bingo Palace contract. He also stated, with no elaboration, that "in the interests of judicial economy and fairness, Defendants respectfully move the Court to transfer venue of this matter to Cuyahoga County, Ohio."
 {¶ 64} The trial court found venue to be proper in both Lake County and Cuyahoga County and stated there was no reason why Cuyahoga County should supersede Lake County for purposes of venue. The court reasoned that Mr. Eilers could not be prejudiced by having the venue in Lake County as he is located out of state and Cuyahoga County could not be a more convenient venue for him than Lake County. The trial court found, moreover, that the interest of judicial economy was not furthered by severing the causes of action and trying them in two separate counties. *Page 17 
 {¶ 65} "Absent evidence of fraud or overreaching, a forum selection clause contained in a commercial contract between business entities is valid and enforceable, unless it can be clearly shown that enforcement of the clause would be unreasonable and unjust." Kennecorp MortgageBrokers, Inc. v. Country Club Convalescent Hospital, Inc. et al. (1993),66 Ohio St.3d 173, syllabus. There is no allegation of fraud or overreaching in this case, therefore, the only issue here is whether it can be clearly shown that the enforcement of the venue selection clause in the Bingo Palace contract would be unreasonable and unjust.
 {¶ 66} An appellate court's review of a trial court's decision to change venue is based on an abuse of discretion standard. SeePremier Assoc, Ltd. v. Loper, 149 Ohio App.3d 660, 2002-Ohio-5538, ¶ 37.
 {¶ 67} Here, Mr. Eilers filed a motion before the trial court, titled "Motion of Defendants to Transfer Venue," the body of which requested the trial court to transfer venue of the instant matter to Cuyahoga County based on (1) the Bingo Palace contract's selection of Cuyahoga County as the choice of venue and (2) "the interests of judicial economy and fairness." On appeal, however, he argues Lake County lacked "subject matter jurisdiction" over the Bingo Palace contract. Mr. Eilers apparently confuses the notion of jurisdiction with venue. As a state court, Lake County enjoys jurisdiction over the instant matter as does Cuyahoga County.
 {¶ 68} As to the issue of venue, two out of the three contracts at issue selected Lake County as the choice of venue. In order to enforce the venue selection provision in the Bingo Palace contract, the trial court would have to sever the matter and have the instant dispute tried at two different courts. A severing of this matter would create a risk *Page 18 
of inconsistent judgments and waste judicial resources, without benefiting either Mr. Eilers or WRG.
 {¶ 69} Because it is clear in this case that the enforcement of the venue selection clause in the Bingo Palace contract would be unreasonable and unjust, and it does not serve the interest of judicial economy, we conclude the trial court did not abuse its discretion in determining that the Lake County venue was proper for the resolution of the subject dispute involving multiple contracts. Mr. Eilers' second assignment of error is without merit.
 {¶ 70} The judgment of the Lake County Common Pleas Court is affirmed.
CYNTHIA WESTCOTT RICE, J., concurs,
COLLEEN MARY O'TOOLE, J., concurs in part, dissents in part with Concurring/ Dissenting Opinion.
[1] Following trial WRG filed a motion for attorney's fees and post judgment interest. The trial court denied an award of attorney's fees but allowed post judgment interest. The parties did not appeal from this judgment.